Debra Groberg (ISB#9797)
Nathan Pittman (ISB#9430)
NEVIN, BENJAMIN & McKAY LLP
303 West Bannock
P.O. Box 2772
Boise, Idaho 83701
Telephone: (208) 343-1000
Facsimile: (208) 345-8274
dgroberg@nbmlaw.com
npittman@nbmlaw.com

*Attorneys for Defendant Ryan Bendawald*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. 1:23-CR-281-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT'S MOTION IN LIMINE** |
| | ) | |
| RYAN A. BENDAWALD, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Table of Contents

I.    Introduction.................................................................................................................1

II.    Background. ...............................................................................................................1

III.    Argument. ..................................................................................................................3

    1.    Evidence of the "Slayer of the Month Club" or the "DFA Squad" at CPD. ......................4

    2.    Evidence of Mr. Bendawald's Other, Consensual Romantic or Sexual Relationships and Rumors About Those Relationships. ................................................................................5

    3.    Evidence of Mr. Bendawald's Internet Search History. ....................................................7

    4.    Evidence of Mr. Hoadley's Convictions and Conduct Towards his CPD Devices. .........12

    5.    Evidence of Mr. Bendawald's Medical Records..............................................................14

    6.    Testimony that Mr. Bendawald Improperly Took Drugs or Property from Individuals He Arrested.................................................................................................................................15

    7.    The Government and its Witnesses Should be Precluded from Referring to the Complaining Witnesses in this Case as "Victims.".........................................................15

    8.    Mr. Bendawald's Alleged Nickname "Bend-the-Law."..................................................17

    9.    Evidence of this Motion or the Court's Ruling on the Matters Set Forth in this Motion. .18

IV.    Conclusion. ..............................................................................................................18

## I.    Introduction.

Defendant Ryan Bendawald, through his attorneys, moves this Court pursuant to Federal Rules of Evidence 103(c), 104(a) and (c), and 611, and *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984), for an order stating the government may not at trial cause or permit the jury to hear, read or otherwise become aware of the evidence identified below in any way, whether through the testimony of its witnesses, in cross examination of defense witnesses, in colloquy, statement, argument, or otherwise, whether in its case in chief or in rebuttal or surrebuttal.

Mr. Bendawald is charged by Indictment with seven counts alleging color of law civil rights violations (Counts One, Three, and Eight) and federal program bribery (Counts Two, Four, Five, Six, and Seven).  To ensure that the trial remains focused on the facts of the actual allegations that comprise the Counts of the indictment, and that Mr. Bendawald is not unfairly prejudiced by the admission of evidence that, at best, is only marginally relevant to those Counts, Mr. Bendawald now moves to exclude such evidence.  The records disclosed in discovery of interviews conducted by the FBI, the government's presentation of evidence to the grand jury, and the pleadings filed in this matter, suggest that the government will attempt to unfairly prejudice Mr. Bendawald with irrelevant or marginally relevant matters.  The Court should prohibit the government from so doing.

## II.    Background.

Mr. Bendawald is charged in eight counts comprising seven discrete episodes where he is alleged to have solicited a woman he encountered while he was policing for sexual favors or committed a sexual assault.[1]  But that is not how this investigation started.  It began in December 2020, when two disgruntled Caldwell Police Department ("CPD") officers (one of whom had lost

---

[1] The government has moved to dismiss Count Six of the indictment, which motion is unopposed.

his position as the sergeant over the Street Crimes Unit to Mr. Bendawald) made wide-ranging allegations of misconduct against multiple officers, but focused on Mr. Bendawald and then-CPD Lieutenant Joey Hoadley, who was accused of using excessive force with detainees.  The FBI's investigation was thus essentially a fishing expedition into CPD, where officers were invited to share rumors, suspicions, and grievances they harbored against their colleagues.  Notably, not a single CPD officer interviewed by the FBI had firsthand knowledge of any of the alleged misconduct Mr. Bendawald is accused of, but several officers took the opportunity to air their grievances with how they believed CPD was being run and how Mr. Bendawald policed.  Some of these rumors pertained to Mr. Bendawald's personal life and his relationship with women, including a particularly pernicious and false rumor that he had a relationship with an underage girl, who was in fact an adult who worked in the same office space as Mr. Bendawald.

Knowledge that the FBI was investigating Mr. Bendawald soon swiftly spread through CPD and the community.  Indeed, as even the lead FBI investigator Special Agent Ryan O'Neil acknowledged, news of the investigation probably got out the afternoon of the FBI's first interviews in early January 2021.[2]  Then the Alleged Victims made their allegations against Mr. Bendawald to the FBI.  Alleged Victim 2, who holds a personal grudge against Mr. Bendawald despite receiving significant benefits for the information she provided him about other drug dealers and gang members, was the first, in March 2021.  Alleged Victim 4 brought out an old allegation once she was facing new charges.  Alleged Victims 5, 6, and 7 likewise made allegations about Mr. Bendawald when they were investigated and facing charges for their crimes, all of which occurred after Mr. Bendawald knew he was under investigation.  Alleged Victim 1 made her

---

[2] SA O'Neil made this statement during his interview of a CPD officer on July 21, 2021.  *See* BENDAWALD_001386 ("but literally when we did the first interview, I think that afternoon it was out.").  The FBI conducted its first interviews in this matter on January 5, 2021.

allegation over a year after the investigation began, when she was sitting in the Canyon County Jail on new drug charges and awaiting a parole hearing. Alleged Victim 3, who denied sexual contact with Mr. Bendawald three times, once in 2019 when she was questioned by CPD Captain Devin Riley (who was taking his cues on how to interrogate her from then-FBI Special Agent Doug Hart), again in 2021 when she was interviewed in federal prison by two local FBI agents, and again in 2023 when she was interviewed by SA O'Neil, finally made an accusation amounting to a misdemeanor during a high pressure interview conducted not just by SA O'Neil but by the lead prosecutor as well.

The government has stated its view multiple times that Mr. Bendawald chose his "victims" because he thought no one would believe them, implicitly conceding the Alleged Victims have serious credibility issues. Which is true: many of them were gang associates, all of them were criminal drug users, there is no physical evidence or other witnesses to corroborate their claims, and each has a motive to fabricate a claim. What hard evidence does exist exposes serious flaws in their stories. The government should not be permitted to shore up their credibility and distract from the real issues in the case by presenting the jury with irrelevant or marginally relevant evidence. The evidence set out below should be excluded from the trial, as its only purpose is to unduly prejudice Mr. Bendawald by convincing the jury he is a "bad cop" or a "bad guy" so that they overlook the actual credibility issues with the individuals the government has chosen to sponsor as the Alleged Victims in this case.

## III.    Argument.

The evidence described below should be excluded because it is irrelevant, or what little relevance it has is substantially outweighed by the concerns identified in Fed. R. Evid. 403, chief among them the risk of unfair prejudice. Relevant evidence is evidence having a tendency to make a fact that is of consequence to determining the action more probable or less probable than it would

be without the evidence.  Fed. R. Evid.  401.  Irrelevant evidence is inadmissible, and relevant evidence may also be excluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 402, 403.

1.      **Evidence of the "Slayer of the Month Club" or the "DFA Squad" at CPD.**

As noted, the FBI's investigation focused not only on Mr. Bendawald, but on Mr. Hoadley and allegations that he engaged in excessive force against suspects.  As such, the FBI gathered evidence that appeared to focus on the culture at CPD, and in particular programs or groups instituted by Mr. Hoadley and others.  The FBI obtained information about the "Slayer of the Month Club," which appeared to have been an incentive program instituted at CPD to encourage officers to be more proactive by recording the number of arrests and citations an officer made in a month and comparing them to their fellow officers.  The government presented to the grand jury a picture of a tabulation of these figures pinned to a bulletin board beneath a piece of printer paper with "Slayer [in the style of the 1980s metal band] of the Month" on it.  The FBI also obtained information about the "DFA Squad," which it was told stands for "Don't Fuck Around," which was also allegedly an informal concept at CPD meant to instill a certain attitude.

Although these concepts existed while Mr. Bendawald was at CPD, it is not clear that he was responsible for creating them, and thus their probative value as to him, as an employee of CPD, is minimal.  One officer has suggested that Mr. Bendawald and Mr. Hoadley confronted him about his failure to participate in the "Slayer of the Month Club," but even if that were the case, the relevance of these concepts to the alleged offenses is marginal at best.  The FBI's investigation into these matters appears to be an artifact of a wider inquiry into the culture of CPD, but the link between that culture and the accusations is tenuous.  Measures intended to encourage officers to be more aggressive in arresting and citing suspects have no relationship to the bribery and sexual

DEFENDANT'S MOTION IN LIMINE - 4

assault conduct alleged here.  Indeed, allowing perpetrators to go in exchange for sexual favors would fly in the face of what CPD was trying to accomplish with the "Slayer of the Month" and the "DFA Squad."  If the purpose of these programs was to inflate an officer's arrest statistics, then failing to cite someone would be counterproductive to that end.

To the extent the government may seek to introduce these concepts, and others, to demonstrate a bad "culture" at CPD, the Court should limit the admission of this evidence to avoid undue prejudice to Mr. Bendawald.  Despite the fact that these concepts have nothing to do with the alleged offenses, the government, by presenting this evidence to the grand jury, has likely recognized that the concepts are useful to make Mr. Bendawald look like a "bad cop."  Under the balancing test in Fed. R. Evid. 403, the government should not be permitted to present generalized evidence such as the "Slayer of the Month Club" or the "DFA Squad" to argue that CPD had a bad culture, with the implication that Mr. Bendawald was influenced by or acted pursuant to that culture.  There is a difference between being aggressive and pushing the boundaries of policing and what Mr. Bendawald is accused of, which is not policing conduct at all.  The risk of undue prejudice to Mr. Bendawald substantially outweighs any probative value of this evidence, in that there is a risk the jury would simply conclude Mr. Bendawald (and other officers at CPD) were generally corrupt or "bad" and base their decision on that fact rather than the evidence.

Therefore, the Court should exclude evidence of the "Slayer of the Month Club" and the "DFA Squad" and thus require the government to focus its evidence on the actual alleged offenses and the circumstances around them rather than general attacks on CPD.

## 2.    Evidence of Mr. Bendawald's Other, Consensual Romantic or Sexual Relationships and Rumors About Those Relationships.

Mr. Bendawald had a complicated relationship history while he was at CPD.  For a period of time Mr. Bendawald and his wife were separated, leading to a divorce in February 2019, only

to marry again after Mr. Bendawald left CPD.  Mr. Bendawald had an off-duty affair with a woman working for the City of Caldwell in the same building where the Street Crimes Unit was located, which resulted in Mr. Bendawald being reassigned out of the Street Crimes Unit to the Patrol unit in April 2017.  During this time Mr. Bendawald had other girlfriends and romantic partners.

Given these circumstances, CPD officers interviewed by the FBI discussed rumors and their own speculation about Mr. Bendawald's romantic activities.  Some officers regarded Mr. Bendawald as the office "pretty boy," noting his attractiveness.  Some of these rumors were pernicious, such as the rumor that the woman Mr. Bendawald had an affair with was underage, which was not true, but indicates the degree to which unchecked rumors and speculation can damage a reputation and take on a life of their own.  The FBI has also interviewed Mr. Bendawald's long term girlfriend during this time and questioned others about Mr. Bendawald's consensual sexual partners and his relationships.

This pattern suggests that the government may attempt to introduce evidence of Mr. Bendawald's consensual, private relationships with other women during the course of the trial. This evidence should be excluded.  First, it fails the test of relevance under Fed. R. Evid. 401, and the government appears to agree.  *See* Gov't's Mots. in Limine at 20-21, Dkt. No. 140 (noting evidence of consensual sex is a "good act" that should be excluded as irrelevant and inadmissible). Whether Mr. Bendawald had other personal, consensual, sexual relationships, regardless of the number or whether he was in multiple relationships at one time, is not relevant to whether Mr. Bendawald abused his authority as a CPD officer to sexually assault or solicit the women he policed for sexual favors.  Other officers' speculation and rumors are not evidence as they are not based on personal knowledge under Fed. R. Evid. 602.

Mr. Bendawald's other relationships also constitute other act evidence under Fed. R. Evid.

404(b) for which the government provided no notice. Indeed, the primary danger of this kind of evidence is that the jury will conclude Mr. Bendawald has a character trait for promiscuity and that he acted in conformity with that trait with respect to the Alleged Victims, precisely the inference that Rule 404(b) is intended to avoid. There is likewise the risk that the jury will simply conclude Mr. Bendawald is a person with bad morals, and judge him on that basis. Nor is there any other permissible purpose for such evidence. *See United States v. Ulloa*, 942 F. Supp. 2d 202, 207 (D. N.H. 2013) ("the court agrees with the government . . . that this instance of marital infidelity, standing alone, has no value in evaluating [the witness's] character for truthfulness or untruthfulness"). Although the government's case is framed as a civil rights and bribery case, it is almost certain the government will present it as a sexual assault case, where Mr. Bendawald's consensual and private sexual relationships create an outsized risk of undue prejudice. Thus, this evidence should also be excluded under Fed. R. Evid. 403, because even if it has a scintilla of relevance, that relevance is substantially outweighed by the danger of unfair prejudice to Mr. Bendawald and risks confusing the issues. *See United States v. Giovinco*, No. 18-cr-14, 2020 WL 832920, at *3 (S.D.N.Y. Feb. 20, 2020) ("Evidence of an affair is not particularly probative of a witness's character for truthfulness, and is often unduly prejudicial, justifying exclusion under Rule 403.").

For the foregoing reasons, evidence of Mr. Bendawald's other consensual sexual or romantic partners should be excluded.

### 3.    Evidence of Mr. Bendawald's Internet Search History.

The government obtained a search warrant for Mr. Bendawald's Google email account, which included his internet search history. This internet search history was the subject of Mr. Bendawald's motion to suppress, Dkt. No. 56, and more recently the government indicated its intent to admit these records under the hearsay exception for a regularly conducted activity, Dkt.

DEFENDANT'S MOTION IN LIMINE - 7

No. 115.   These records should be excluded because their probative value is substantially outweighed by the risk of unfair prejudice to Mr. Bendawald.  Moreover, Mr. Bendawald's internet search activity is unconnected to the alleged offense conduct, and therefore constitutes unnoticed "other acts" for purposes of Rule 404(b).

The government collected an extensive amount of Mr. Bendawald's internet search history, pulling in searches from a three-year period from 2018-2021.  The vast majority of these searches are completely irrelevant to this case.  In its response to Mr. Bendawald's motion to suppress, the government attempted to identify relevant categories of evidence present in Mr. Bendawald's search history, but this effort merely demonstrates how the government may intend to use Mr. Bendawald's search history to improperly inflame the jury against him.  *See* Resp. to Mot. to Suppress at 20, Dkt. No. 63.

The government first highlighted what it characterized as a search showing Mr. Bendawald's "efforts to leave the department after he learned of the FBI's investigation."  *Id*.  Mr. Bendawald, like many people, made searches that indicated he might have thought about leaving CPD for a different job, and some of these searches occurred in January 2021, shortly after Mr. Bendawald knew the FBI was investigating CPD.  But the relevance of these searches is not clear, even if they were prompted by the FBI investigation.  The inference that they suggest a guilty mind is marginal at best, especially given that Mr. Bendawald had already left CPD once before to pursue another career, and that he stayed in his position at CPD until November 2021.  The inference that Mr. Bendawald may not have wanted to put himself and his family through an investigation started by disgruntled officers and where pernicious and false rumors made his work environment increasingly toxic and mistrusting, is just as if not more plausible than a guilty mind.  The government would essentially be inviting the jury to speculate on a matter with only a

DEFENDANT'S MOTION IN LIMINE - 8

tendential involvement to the alleged crimes, which would unfairly prejudice Mr. Bendawald in the process. For that reason, these searches should be excluded under Fed. R. Evid. 403.

The government next cited to searches it alleges showed an interest in sexual-assault pornography. *See* Resp. to Mot. to Suppress at 20, Dkt. No. 63. As stated in Mr. Bendawald's Reply in support of his Motion to Suppress, defense counsel has reviewed Mr. Bendawald's search history produced by the government and it is not clear what searches the government is referring to. No doubt Mr. Bendawald, like millions of Americans, searched the internet for sexually explicit topics, none of which appear to have any relation to the charged offenses. These searches, therefore, constitute other acts evidence the government was required to provide notice of under Fed. R. Evid. 404(b), and they should be excluded on that basis alone. *See United States v. Mitchell*, No. CR-22-1545, 2024 WL 3567857, at *4 (D. Ariz. July 29, 2024) (rejecting argument that search terms were intrinsic to the offense). Moreover, given that none of the search terms implicate conduct or acts similar to the charged offenses, there is no purpose for admitting these searches other than character inferences forbidden by Fed. R. Evid. 404(b). It is also plain that the government's efforts to twist unrelated searches into evidence against Mr. Bendawald runs a high risk of unfair prejudice that substantially outweighs any probative value, and thus the evidence should also be excluded under Fed. R. Evid. 403.

The government next points to Mr. Bendawald's alleged "attempts to find female arrestees in Idaho" and his searches for Oregon and Idaho codes related to "contributing to the sexual delinquency of a minor." *See* Resp. to Mot. to Suppress at 20, Dkt. No. 63. These categories simply show the extent to which the government is reaching into irrelevant evidence to either bolster the claims of the Alleged Victims or unfairly tear down Mr. Bendawald in front of the jury. Mr. Bendawald was a police officer, and thus locating arrestees and understanding the law were

DEFENDANT'S MOTION IN LIMINE - 9

part of his job.  The government does not allege, nor does Mr. Bendawald's search history suggest, that his searches pertained to any of the Alleged Victims.  Mr. Bendawald's searches for the Oregon and Idaho codes occurred on September 3, 2020,[3] before the FBI investigation even started, and none of the Alleged Victims are alleged to have been underage at the time of the alleged offenses.  The searches are truly irrelevant, and thus do not even pass muster under Fed. R. Evid. 401, let alone the Rule 403 balancing test.  Again, these searches constitute unnoticed Rule 404(b) evidence and should be excluded on that basis in addition to being irrelevant.

The government also points to Mr. Bendawald's alleged attempts to disable GPS tracking on his cellphone.  *See* Resp. to Mot. to Suppress at 20, Dkt. No. 63.  There is no evidence that these searches (which, again, are unnoticed Rule 404(b) evidence and should be excluded on that basis alone) had anything to do with the alleged offense conduct.  Indeed, on September 4, 2020 (before the FBI investigation started) Mr. Bendawald searched "does sharing your location improve or hurt your relationship,"[4] and on January 24, 2021 (after he was aware of the FBI investigation) Mr. Bendawald searched "can friends see current location if location services is turned off."[5]  Find My Friends is an application where a user can voluntarily share their location with any selected contact.  Apple devices, including iPhones, have a similar application called "Find My" that is also generally referred to as "Find My Friends" where the user can choose to share their location with any individual contact.  It is also fairly common knowledge that if a user stops sharing location with someone through the application, that person is notified that the user stopped sharing their location.  To the contrary, turning off location services does not send a notification.  Mr. Bendawald's searches suggest he was concerned with relationship partners

---

[3] *See* GMAIL_000289-290.
[4] *See* GMAIL_000278.
[5] *See* GMAIL_000220.

DEFENDANT'S MOTION IN LIMINE - 10

tracking him through his phone, which does not include the Alleged Victims, the FBI, or CPD. Given that none of these searches are correlated with the alleged offenses and an innocent explanation is apparent in the searches themselves, their probative value is weak, and is substantially outweighed by the risk of unfair prejudice of the general and unsupported inference that Mr. Bendawald was hiding his supposedly illicit activity.

Lastly, the government points to a search Mr. Bendawald made on January 26, 2021 regarding the possibility of a defamation of character lawsuit, while also alleging that Mr. Bendawald threatened to sue another officer on the same day, conduct the government asserts was obstructive. *See* Resp. to Mot. to Suppress at 20, Dkt. No. 63. The government appears to refer to a recording of Mr. Bendawald made (against CPD policy) by Officer Joe Cardwell, one of the disgruntled officers who first complained to the FBI, and who at the time worked with the FBI as a member of the Metro Task Force. Mr. Bendawald told Mr. Cardwell he had spoken to an attorney about a defamation suit, primarily with respect to false rumors being spread about him that he had a relationship with an underage girl; while repeatedly telling Mr. Cardwell he did not think Mr. Cardwell was involved.[6] If Mr. Cardwell felt threatened by this statement, it was because, although

---

[6] *See* BENDAWALD_001242-1255. If anyone on that call was obstructive, it was Mr. Cardwell, who repeatedly told Mr. Bendawald to "be honest" and tell the FBI Mr. Cardwell's version of events as to Mr. Hoadley's alleged misconduct, or he would be "held accountable as well." *Id.* Mr. Cardwell's comments echoed what he said on a prior call he recorded with Mr. Bendawald in December 2020. Mr. Bendawald told Mr. Cardwell he did not remember the event, and Mr. Cardwell told Mr. Bendawald that he "better be truthful" when someone (the FBI) asked him about it and if he did not remember he needed "to take a lie detector test to that as well," and "you better be fucking honest." BENDAWALD_001263. After referencing a prior allegation against Mr. Bendawald that Mr. Cardwell knew about because it had come in through an FBI informant, Mr. Cardwell again told Mr. Bendawald "if something comes up you better be honest dude because you'll fuck yourself." BENDAWALD_001264. He added "I'm telling you right now, someone comes and talks to you about some shit, then you need to be honest bro, cause I don't want you fucking going down for somebody else's bullshit." BENDAWALD_001266.

DEFENDANT'S MOTION IN LIMINE - 11

he lied to Mr. Bendawald repeatedly that he was not spreading rumors or "talking shit about you,"[7] Mr. Cardwell was in fact one of the officers spreading the false and obviously defamatory rumor that Mr. Bendawald had a relationship with an underage girl.[8] By Mr. Cardwell's own admission, he was defaming Mr. Bendawald.

Mr. Bendawald's exploration of legal recourse against individuals spreading rumors that are on their face defamatory and that include allegations not at issue in this case is of little to no probative value. Hiring a lawyer and availing oneself of the legal process, a public process that involves a legal professional, is not strong evidence of obstruction. The risk of unfair prejudice, by contrast, is significant, especially because Mr. Bendawald would have to disclose to the jury the extremely prejudicial false rumor, which has no place in this trial, to explain why he told Mr. Cardwell he was consulting an attorney regarding a potential defamation suit. Mr. Bendawald would thus be placed in an unduly prejudicial double bind: either allow the government to present marginally probative evidence of "obstruction" without challenge, or disclose to the jury a rumor that, even when false, would risk turning jurors against him. Mr. Bendawald should not be placed in that position, and therefore the Court should exclude evidence of the search for defamation lawyers under Fed. R. Evid. 403.

### 4. Evidence of Mr. Hoadley's Convictions and Conduct Towards his CPD Devices.

Mr. Hoadley was convicted in 2022 of various obstruction offenses, in essence for falsifying a report (although he was acquitted of the excessive force he was supposed to have falsified the report to conceal), wiping his devices before returning them to CPD, and for

---

[7] BENDAWALD_001250.

[8] As Mr. Cardwell recorded on November 12, 2020 in the notes he was keeping on his efforts to rid CPD of Mr. Hoadley and Mr. Bendawald: "I informed Capt. Riley of a rumor I had heard about Sgt. Bendawald having an inappropriate relationship, possibly with a juvenile back when he was a SCU detective." *See* BENDAWALD_003665.

intimidating a witness.[9]  The fact of Mr. Hoadley's convictions are irrelevant with respect to Mr. Bendawald, and the conduct underlying those convictions is either irrelevant, has not been properly noticed under Rule 404(b), or its probative value is substantially outweighed by the risk of undue prejudice and should be excluded under Rule 403.

Whether Mr. Hoadley falsified a report, for an incident Mr. Bendawald was not involved in, is wholly irrelevant.  Likewise, whether Mr. Hoadley caused data to be deleted from his CPD-issued devices is also irrelevant, yet the government's disclosure of its expert witness Tom Paschal indicates it intends to elicit testimony from him regarding these devices.  *See* U.S.'s Notice of Intent to Offer Expert Testimony Under Federal Rule of Evidence 702 at 2 n.2, Dkt. No. 131 (identifying Mr. Hoadley's MacBook Pro Laptop and iPhones as potential topics of Mr. Paschal's testimony).  These devices were returned to CPD months after Mr. Bendawald resigned and there is no evidence he was involved in Mr. Hoadley's conduct.

Mr. Hoadley's final conviction related to a meeting he and Mr. Bendawald had with another CPD officer, Chad Hessman, who testified that he felt intimidated by Mr. Hoadley.  Mr. Bendawald was experiencing professional difficulties with Mr. Hessman, who was in a separate task force unit, and wanted to discuss those issues with Mr. Hessman's supervisor at CPD, Mr. Hoadley.  Mr. Bendawald is not responsible for what Mr. Hoadley said to this officer, and whatever Mr. Bendawald may have done in this meeting constitutes Rule 404(b) evidence that the government has not noticed.  Even if Mr. Hoadley's conduct had some limited relevance for Mr. Bendawald, its probative value would be substantially outweighed by the risk of unfair prejudice.  Mr. Hessman has never stated he has any direct knowledge of any of the conduct with which Mr.

---

[9] Mr. Hoadley was acquitted of the most serious charge of violating a suspect's civil rights through the use of excessive force.

Bendawald was charged.  By contrast, the disgruntled officers complained to the FBI that Mr. Hessman had directly witnessed Mr. Hoadley showing other officers a video of him punching a suspect while he was handcuffed.  Mr. Hessman was thus a key witness with respect to the allegations against Mr. Hoadley.[10]  The same is not true with respect to Mr. Bendawald.

Therefore, evidence of Mr. Hoadley's conduct towards Mr. Hessman should be excluded. The government is expected to attempt to tie Mr. Bendawald to Mr. Hoadley, and the Court should draw tight boundaries around those efforts lest the government attempt to taint the jury against Mr. Bendawald by association.

### 5.    Evidence of Mr. Bendawald's Medical Records.

On May 21, 2025, the government filed a Notice of Intent to Introduce Records Under Fed. R. Evid. 902, Dkt. No. 115, which among other documents identified records produced by Emergency Responders Health Center.  The bates range for these records corresponds with records of Mr. Bendawald's visit to his doctor on the morning of March 12, 2021.[11]  The relevance of these records (which appear to be of an annual wellness exam) to any of the alleged offenses is not clear. The date of the appointment, March 12, is one day after the alleged encounter with Alleged Victim 7, and the same day as the allegations that form the basis of Count Five, but the timing of the appointment appears to be a coincidence.  Lacking probative value, there is no reason for Mr. Bendawald's personal medical records to be admitted into evidence at trial, and they should be excluded.

---

[10] At the time Mr. Hessman testified for the government at Mr. Hoadley's trial, he was under investigation by Idaho Peace Officer Standards and Training, and internally by CPD's new chief, on allegations that he lied to the FBI when he stated he could not recall seeing the video, among other things.  Mr. Hessman had been interrogated regarding his knowledge of the video two weeks before he testified.

[11] *See* BENDAWALD_032322 to BENDAWALD_032333.

6.    **Testimony that Mr. Bendawald Improperly Took Drugs or Property from Individuals He Arrested.**

Various individuals the government has interviewed throughout this investigation have told the FBI that Mr. Bendawald confiscated drugs, money, or other property from them for his own purposes.  No allegation of stolen drugs or money has been corroborated.  Such allegations would constitute unnoticed Rule 404(b) evidence and should be excluded on that basis, but given their unproven nature admitting these allegations would also unduly prejudice Mr. Bendawald without providing any commensurate probative value, and would risk a mini-trial on each alleged theft. The government should therefore be excluded from presenting any of these allegations and should be required to advise its witnesses to refrain from bringing up the same.[12]

7.    **The Government and its Witnesses Should be Precluded from Referring to the Complaining Witnesses in this Case as "Victims."**

At this point, the claims of the Alleged Victims are just that: claims.  They have not been adjudicated to be "victims," there has been no finding that their civil rights were violated or that they were solicited for purposes of or engaged in bribery.   Under these circumstances, it is appropriate for the Court to instruct the government and its witnesses not to refer to the complaining witnesses as "victims."

Under Fed. R. Evid. 403, allowing the government and its witnesses to use the term "victim" while testifying would create a substantial risk of prejudicing Mr. Bendawald.  *See United States v. Barela*, No. 1:20-CR-01228, 2021 WL 5177739, at *2 (D.N.M. Nov. 8, 2021) ("[T]o refer to any witness as 'the victim' . . . during the trial carries a significant risk of bias and is likely to

---

[12] Alleged Victims 1 and 2 allege Mr. Bendawald took drugs from them at the time of the alleged offenses, though there is no record of him having done so.  Mr. Bendawald does not seek to exclude this evidence, which is part of the Alleged Victims' stories.  Instead, Mr. Bendawald's motion seeks to exclude evidence of other, unproven, unrelated allegations that Mr. Bendawald stole other drugs on different occasions.

DEFENDANT'S MOTION IN LIMINE - 15

improperly influence the jury. Thus, the Court finds that the probative value of these terms is substantially outweighed by the danger of unfair prejudice."). There is no probative value in referring to the complaining witnesses as victims and any marginal value is substantially outweighed by the prejudice the term creates against Mr. Bendawald. *See United States v. Garcia-Limon*, No. CR 21-0032, 2022 WL 3334498, at *1 (E.D. Okla. May 16, 2022) ("[T]here is virtually no probative value in allowing the government to use the term 'victim' to describe [the individual].") (quotation omitted). The Court should extend the limitation on the use of the term "victim" to the testimony of the government's witnesses. *See United States v. Sena,* No. 19-CR-01432, 2021 WL 4129247, at *2 (D.N.M. Sept. 9, 2021) (holding that prejudice from use of term by witnesses substantially outweighed its probative value). The government and its witnesses can just as easily address and refer to the women by their names without running the risk of improperly vouching for their credibility or influencing the jury. *See United States v. Johnson*, No. 19 CR 405, 2024 WL 1486760, at *2 (N.D. Ill. Apr. 5, 2024) (complaining witnesses will be referred to as "individual" or "complaining witness," rather than "victim."); *see also Barela*, 2021 WL 5177739, at *2 (the government and its witnesses may not refer to any individual as a "victim" during the presentation of its evidence as the frequent use of the term "may be unfairly prejudicial to a defendant[.]").

Restricting the government from referring to the Alleged Victims as "victims" is particularly appropriate here, where Mr. Bendawald maintains his innocence and his defense will be that the offenses simply did not happen. Courts have ruled that in such cases it is improper for parties to refer to complaining witnesses as victims. *See Barela*, 2021 WL 5177739, at *1 ("[T]he use of the term 'victim' to refer to the complaining witness or other witnesses, in circumstances where the accusers' own testimony is the only evidence that the alleged criminal conduct occurred,

conveys the speaker's belief that the accusers are credible"); *Sena*, 2021 WL 4129247, at *2 ("[T]he term [victim] is prejudicial when the core issue at trial is whether a crime has been committed—and, therefore, whether there is a victim"); *United States v. Ehrens*, No. CR-15-20, 2015 WL 7758544, at *2 (W.D. Okla. Dec. 1, 2015) ("[T]he Court finds no need by any party to refer to [the complaining witness] by any particular descriptor other than her name."); *United States v. Hellard*, No. 24-CR-87, 2024 WL 2378931, at *2 (N.D. Okla. May 23, 2024) ("[T]he Court concludes that there is no reason for the use of the term 'victim' through the presentation of evidentiary phase of the trial.").

### 8.    Mr. Bendawald's Alleged Nickname "Bend-the-Law."

Throughout the investigation, witness have told the government that Mr. Bendawald has a nickname in the community: "Bend-the-Law."  It is not clear where the nickname originated from (possibly from the public defender's office), nor is it clear precisely what it means.  Some have stated they believe it means Mr. Bendawald operated in the "grey area" by pushing the boundaries of the law to combat Caldwell's drug and gang problem, others said it was based on how aggressive he could be, and others still heard it as "Bend a Lose" because Mr. Bendawald had cases that were dismissed or lost at trial.  No one, however, stated that the nickname had anything to do with Mr. Bendawald's relationship with the women he policed.  What is clear is that the government questioned multiple witnesses about this nickname in the grand jury, and it mentioned the nickname in its Motion in Limine.  *See* Gov't's Mot. in Limine at 6, Dkt. No. 140.  Because allowing witnesses to repeat this nickname and to speculate as to its meaning has very little probative value, while such musings risk substantially prejudicing Mr. Bendawald, the government should be prohibited under Rule 403 from eliciting testimony of it.

The "Bend-the-Law" nickname has little to no probative value for the crimes charged. Testimony that Mr. Bendawald had such a nickname is essentially a form of character evidence

that is inadmissible under Rule 404(a), and is doubly inadmissible because by the nature of nicknames the person repeating it often has no firsthand knowledge of why the individual has it in the first place.  That is evident here, as there was no consensus among the witnesses as to why Mr. Bendawald had the nickname "Bend-the-Law."  If a witness were to speculate why he had the nickname, or cite to specific conduct that "earned" the nickname, that testimony would either be inadmissible as speculative and not based in the witness's personal knowledge or would be unnoticed "other act" evidence under Rule 404(b).

The only purpose of getting the nickname before the jury is to unduly prejudice Mr. Bendawald through the inference that he is a "bad cop."  It is likely that the jury would give undue weight to the nickname, which could mean anything and thus could lead the jury into speculation of its own.  Because the nickname ultimately signifies nothing of probative value in this case, and the risk of undue prejudice is substantial, the government should be precluded from disclosing the nickname to the jury and should be directed to instruct its witnesses to refrain from using it.

    **9.**    **Evidence of this Motion or the Court's Ruling on the Matters Set Forth in this Motion.**

The Court should exclude any reference to or inference concerning the filing of this motion and the Court's rulings on it.

## IV.    Conclusion.

For the foregoing reasons, Mr. Bendawald requests that the Court enter an order excluding the above-referenced evidence.

DATED this 1st day of August 2025.

NEVIN, BENJAMIN & McKAY LLP

/s/ Debra Groberg
Debra Groberg

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 1st day of August 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

       Katherine L. Horwitz
       United States Attorney's Office
       khorwitz@usdoj.gov

                         /s/ Debra Groberg
                         Debra Groberg

DEFENDANT'S MOTION IN LIMINE - 19