Debra Groberg (ISB#9797)
Nathan Pittman (ISB#9430)
NEVIN, BENJAMIN & McKAY LLP
303 West Bannock
P.O. Box 2772
Boise, Idaho 83701
Telephone: (208) 343-1000
Facsimile: (208) 345-8274
dgroberg@nbmlaw.com
npittman@nbmlaw.com

*Attorneys for Defendant Ryan Bendawald*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:23-CR-281-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT'S RESPONSE TO** |
| | ) | **GOVERNMENT'S MOTIONS IN** |
| RYAN A. BENDAWALD, | ) | **LIMINE [Dkt. 140]** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Table of Contents

I.    Portions of the Phone Calls Proffered by the Government Should be Excluded Under Rule
      403. ................................................................................................................................4

II.   Mr. Bendawald Does Not Object to the Admission of Phone Records or the Alleged
      Victims' Custodial Records. ............................................................................................5

III.  The Court Should Exclude the Government's Untimely Rule 404(b) Evidence to Avoid a
      Mini-Trial on Marginal Issues. ......................................................................................6

  A.  Mr. Bendawald Was Not the Suspect of the November 2, 2021 Police Incident and the
      Court Should Avoid a Mini-Trial on the Issue.................................................................7

  B.  Mr. Rohrback's Non-Probative Allegation Regarding GPS Tracking Should be Excluded
      from Trial. ........................................................................................................................12

IV.   The Government's Motion to Exclude Self-Serving Hearsay is Premature........................13

V.    The Court Should Deny the Government's Request to Exclude All Personal Information
      About Mr. Bendawald and Mr. Bendawald Will Not Advance the "Jury Nullification"
      Arguments the Government Seeks to Preclude...................................................................14

VI.   The Defense Will Not Question the Government's Motivations or Exercise of its
      Prosecutorial Discretion, but Must Be Able to Challenge the Government's Investigation
      and Question Government Witnesses for Bias and Motivation. .........................................15

VII.  Mr. Bendawald Does Not Object to Some of the Proposed Protection for Witnesses, but
      Must be Able to Question the Witnesses and Present Evidence Regarding Their Criminal
      Conduct and Gang Affiliation..........................................................................................18

  A.  References to Drug Use and Gang Membership and/or Association. .............................19

  B.  Cross Examination of the Alleged Victims. ..................................................................23

  C.  Mental Health Records. .................................................................................................24

VIII. The Alleged Victims' Criminal History. .........................................................................25

IX.   Neither Defense Expert Will Invade the Province of the Jury...........................................28

## INTRODUCTION

The defendant, Ryan Bendawald, through undersigned counsel, submits this Response to the government's Motions in Limine, Dkt. No. 140.  Many of the government's motions essentially restate the Rules of Evidence without asking the Court to apply them to specific evidence, and thus no order from the Court is required on those matters at this stage.  Mr. Bendawald has also noted where the defense is in agreement with the government, in an attempt to narrow the issues for the Court.  In general, Mr. Bendawald objects to the government's attempts to include irrelevant and late-noticed evidence, such as the November 2, 2021 police incident, and its efforts to prevent Mr. Bendawald from presenting evidence on and questioning the Alleged Victims about relevant and highly probative facts related to their criminal conduct and gang affiliation or membership.

This case will in large part be about how and why Mr. Bendawald encountered the Alleged Victims while he was performing his police duties. The government's theory of the case, as expressed in its filings to date, is that Mr. Bendawald targeted the Alleged Victims because he wanted to extract sexual favors from them, not for a legitimate law enforcement purpose, and that his encounters with them were "harassment," "stalking," or outright "abusive."  The defense must be able to put on evidence showing that Mr. Bendawald had a legitimate law enforcement purpose, which requires presenting evidence regarding the Alleged Victims' criminal conduct and their ties to gangs and illegal drugs.  Indeed, the jury will get a misleading picture, and Mr. Bendawald will be unduly prejudiced, if the defense is not permitted to present evidence regarding the criminal conduct that led the police to encounter the Alleged Victims, what happened during those police encounters, how their ties to gangs and illegal drugs led Mr. Bendawald to encounter them, and their roles as confidential sources for Mr. Bendawald, where appropriate.  This evidence is not presented to demean or harass the Alleged Victims; it is necessary to tell the story of this case.

## ARGUMENT

**I.     Portions of the Phone Calls Proffered by the Government Should be Excluded Under Rule 403.**

Mr. Bendawald recognizes that the statements he made in his conversations with Mr. Cardwell (who was recording those conversations against CPD policy) are party-opponent statements for purposes of Fed. R. Evid. 801(d)(2).  However, "[t]o determine the admissibility of the statement, the Court must consider two separate issues: First, whether the statement is that of a party-opponent . . .  and second, assuming the statement is that of a party-opponent, whether it passes the general requirements of Rules 401 and 403."  *See United States v. Bakshinian*, 65 F. Supp. 2d 1104, 1105 (C.D. Cal. 1999).  As noted in Mr. Bendawald's Motion in Limine, these calls involve highly prejudicial and false allegations that Mr. Bendawald had a sexual relationship with a minor, which have nothing to do with this case.  The Court should ensure that such matters are not brought before the jury.

Mr. Cardwell created these recordings while he was in the process of attempting to get rid of then-Lieutenant Joey Hoadley at the Caldwell Police Department ("CPD").  As detailed in Mr. Bendawald's Motion in Limine, if anyone on these calls was obstructive and attempting to influence a witness's testimony, it was Mr. Cardwell, who repeatedly issued veiled threats to Mr. Bendawald that he had better corroborate Mr. Cardwell's claims against Mr. Hoadley or he would suffer consequences as well.  *See* Def.'s Mot. in Limine at 11-12, Dkt. No. 144.  A fair reading of the calls suggests that the best interpretation is that Mr. Bendawald was understandably upset that his coworkers were spreading rumors about him having a relationship with an underage girl, while also expressing his innocence with respect to other rumors about him having inappropriate contact with confidential sources.  All of Mr. Bendawald's statements are consistent with an innocent man trying to defend his reputation and career from being gratuitously destroyed by unfounded rumors

spread by individuals like Mr. Cardwell who had an axe to grind against CPD leadership.

The government is, of course, free to argue for a different interpretation. But in the guise of presenting evidence that Mr. Bendawald made statements connected with the investigation and the allegations in the indictment, the government should not be permitted to put before the jury the irrelevant, extremely prejudicial, and false allegation that Mr. Bendawald had a relationship with an underage girl. The government has presented no evidence of this, and there is none; the individual in question was an employee of the City of Caldwell and was an adult. Any reference to rumors that Mr. Bendawald had such a relationship should therefore be excluded under Fed. R. Evid. 403, if not under Fed. R. Evid. 401 for lack of relevance. In addition, Mr. Bendawald's statements regarding pursuing individuals spreading those rumors for a defamation claim should also be excluded, because evidence of Mr. Bendawald attempting to protect his reputation from these obviously defamatory rumors is not probative of whether he had a guilty mind with respect to the charges in the indictment. The rest of the recordings are sufficient for the government's purposes, and Mr. Bendawald should not be put in the position of having to defend his statements regarding bringing a defamation action by being forced to disclose the highly prejudicial and irrelevant defamatory statement that would have no role in this case otherwise.

Therefore, Mr. Bendawald does not object to the admission of his statements to Mr. Cardwell regarding allegations related to the charges in the indictment, but objects to the admission of the entire recordings to the extent they touch on the matters discussed above.

## II.    Mr. Bendawald Does Not Object to the Admission of Phone Records or the Alleged Victims' Custodial Records.

Mr. Bendawald does not object to the admission of his phone records on December 3, 2018, the date on the government's proposed summary exhibit, *see* Gov't Ex. 4, or the admission of the custodial records for the Alleged Victims. To the extent the government may seek to admit

evidence of phone calls on other dates, Mr. Bendawald does not object to the authenticity of those records, but reserves the right to raise objections under Fed. R. Evid. 401 and 403 or any other reason why the records should not be admitted.  Mr. Bendawald also does not object in principle to the use of a summary exhibit for these phone records, however consistent with Mr. Bendawald's Motion in Limine to preclude reference to the Alleged Victims as "victims," Def.'s Mot. in Limine at 15-17, Dkt. No. 144, and the government's agreement that the Alleged Victims should not be referred to as "victims" during the presentation of evidence, Gov't's Resp. to Def.'s Mot. in Limine at 14, Dkt. No. 150, the proposed exhibit should not refer to "Victim 2" but should use the designation for that individual determined before trial.

## III.    The Court Should Exclude the Government's Untimely Rule 404(b) Evidence to Avoid a Mini-Trial on Marginal Issues.

The government asks the Court to admit evidence from former CPD Officer Nathan Rohrback regarding two episodes during his career involving Mr. Bendawald.  The government provided notice of this evidence on July 21, 2025, Supplemental Notice Pursuant to Federal Rule of Evidence 404(b), Dkt. No. 135 ("Rule 404(b) Notice"), well outside of the deadline set by the Court for noticing Fed. R. Evid. 404(b) evidence, Dkt. No. 74.  The government first interviewed Mr. Rohrback on January 25, 2021, where Mr. Rohrback made very clear that he disapproved of Mr. Bendawald.  The government waited until now to return to Mr. Rohrback, and its notice is therefore untimely and this evidence should be excluded for late notice alone.[1]

The evidence should also be excluded because it is not probative for any purpose other than to make Mr. Bendawald look like a "bad cop," and whatever probative value it may have is

---

[1] The government asserts that Mr. Rohrback's testimony will be the only "other acts" evidence offered by a CPD officer, and that it is important that the Court know this.  Mot. at 14.  But the standard is the same whether one or a dozen CPD officers were offering "other act" evidence; the fact that Mr. Rohrback is the only CPD witness the government intends to sponsor for "other act" evidence is irrelevant.

DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTIONS IN LIMINE - 6

substantially outweighed by the risk of undue prejudice.  Indeed, the episode on November 2, 2021, is precisely the kind of evidence that Fed. R. Evid. 403 was enacted to exclude.  It has nothing to do with any of the charges in the indictment, bears only the most superficial resemblance to the conduct in a single charge, and ultimately would require a mini-trial before the jury on whether the individual at issue was Mr. Bendawald at all.  Rule 403's concerns for wasting time and confusing the jury on the actual issues in this case are at their maximum when it comes to this collateral issue.

And, to be clear, Mr. Bendawald was not the suspicious individual who was the subject of the 911 call on November 2, 2021.  The government omitted important facts from the materials it produced in discovery and made misstatements about others, but once all those facts are considered it is clear that Mr. Bendawald was not the "prowler" (a term no one used at the time and that the government appears to have adopted for its prejudicial implications).  It is necessary to demonstrate at length why the government's new allegation is unfounded, which also shows the amount of trial time that would be wasted on this marginal issue that can only confuse the jury as to the real issues in the case.

A.    **Mr. Bendawald Was Not the Suspect of the November 2, 2021 Police Incident and the Court Should Avoid a Mini-Trial on the Issue.**

At 9:25 pm, a pizza delivery driver in Caldwell called 911 to report that she saw a man on the street who seemed to be running away from something.  He had a gun in his hand, was wearing a black hood, and had a face covering.  SA O'Neil interviewed this delivery driver on July 22, and she provided additional details of her observations of this individual that were not included in her report to CPD.[2]  Despite having a poor memory of the events, and only seeing the individual in

---

[2] The facts here are based on the recording of the interview with the delivery driver rather than SA O'Neil's report, which is incomplete and misstates facts from the interview.  *See* BENDAWALD_043389.

her headlights on a dimly lit street, she managed to recall some details.  When she saw the individual, they were coming out from behind a house, like they were coming out of a back door.  Then the individual ran down the street, looking back while they were running.  She remembered that the individual was well covered up and was wearing baggy clothing with a hooded sweatshirt.  She saw that the individual had a gun and was trying to put it in his pocket or in his jacket, which drew her attention.  The caller described the individual she saw as slim, not in an athletic way, but outright skinny based on the way his baggy clothes were hanging off of him.  She guessed his height was between 5'7" and 6'0".  She had no clue as to his age, but guessed he was in his early 20s based on how energetically he was running.

After the delivery driver called 911, dispatch created an incident number, DR 21-34125, and assigned Mr. Bendawald to it.  Email records produced by the government show that, before the call came in, Mr. Bendawald was sending emails from his work account as he prepared to depart CPD (this was one of Mr. Bendawald's last days at the office before he resigned).  At 9:27 pm, Mr. Bendawald entered into his computer (called an "MDC") that he was "en route" to respond to the call.  At the same time, Mr. Rohrback called over the radio that he was pretty close to the scene of the report and would break off what he was doing to go investigate.  He radioed that he was in the area by 9:28 pm.  Two minutes later, at 9:30 pm, Mr. Rohrback called over the radio that he was unable to locate the suspect.  Mr. Bendawald continued to communicate with Mr. Rohrback over the radio during this time.

Still looking for the suspect, Mr. Rohrback spotted a vehicle he thought was suspicious and initiated a traffic stop at 9:32 pm, which resulted in the creation of a second call, DR 21-34126.  Mr. Bendawald went to assist Mr. Rohrback, and at 9:35 pm he called over the radio asking Mr. Rohrback to confirm his location.  Mr. Rohrback gave the address, and Mr. Bendawald likely

DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTIONS IN LIMINE - 8

arrived on the scene at 9:39 pm when he entered that information into his MDC.[3]

Mr. Rohrback told SA O'Neil that he observed Mr. Bendawald exit his vehicle and saw he was wearing a black hoodie and jeans and was putting on his tactical vest. Mr. Rohrback found this "highly suspicious" based on his "cop intuition." Of course, it was not unusual for Mr. Bendawald to wear a black hoodie as part of his uniform. At the time, he was the sergeant of the Street Crimes Unit, which did not wear the standard patrol uniform as the Street Crimes Unit attempted to blend into the community. Body-worn camera footage of the arrests of Alleged Victim 5 and Alleged Victim 7 in March 2021 shows Mr. Bendawald wearing a black hoodie under his police vest. Given that Mr. Bendawald was sending emails in the hours prior to the call, he likely came from CPD to assist. Mr. Rohrback said nothing about Mr. Bendawald having a face covering, and no description was ever given of the pants the "prowler" was wearing.[4]

The picture provided by the actual evidence is thus quite different from what the government indicates in its Motion and Rule 404(b) Notice. The delivery driver seems to have described seeing an individual who was trying to rob a house and then ran away. It is implausible that this individual would be Mr. Bendawald (which they were not) when Mr. Bendawald was on the computer just two minutes after the call came in. Indeed, the government's Motion makes it seem as if Mr. Bendawald was hiding his presence, that he "suddenly appeared," Mot. at 15, when it is clear he was assigned to the call by dispatch, called in his involvement over the radio, told Mr.

---

[3] This incident illustrates a common issue with how CPD kept track of calls, which may arise at trial. The original call for the armed individual was created as DR 21-34125. When Mr. Rohrback pulled over the vehicle, this resulted in the creation of a new call, DR 21-34126, and dispatch kept track of his radio messages in the log for this new number. However, Mr. Bendawald remained on DR 21-34125, so when he went to assist Mr. Rohrback with his traffic stop his calls likely remained logged under the original number. Thus, to get the full story of what happened, one has to consult two different call logs.

[4] SA O'Neil records in his report of his interview with the caller that she saw a man wearing "a hoodie and jeans," but the recording of the interview does not include this statement.

Rohrback he was on his way to the traffic stop, and generally did nothing to conceal himself.

The government also overstates the evidence when it claims Mr. Bendawald matched "the prowler" "in both physical appearance and in dress." Rule 404(b) Notice at 2. The only consistent clothing is the black hoodie, a very common clothing item, and there is no mention of Mr. Bendawald having a face covering. The caller described the "prowler" as much younger than Mr. Bendawald, and skinny where Mr. Bendawald has an athletic build. The description of the individual's clothing as baggy, and hanging off of his frame, also does not match Mr. Bendawald's dress, but does seem to match general street clothing. Nor is the description of the runner fumbling with his handgun and trying to put it into his pocket consistent with Mr. Bendawald, who was trained in the use of firearms, was a member of CPD's SWAT team, and who had access to a holster.

These circumstances are plainly insufficient to conclude with any degree of confidence that Mr. Bendawald was the armed individual seen running from a house (where the government got the idea this individual was running through backyards is not clear). The description of that individual either does not fit Mr. Bendawald (younger, skinny, baggy clothes, face covering) or is so broad as to fit almost anyone (a height between 5'7" and 6'0" describes most men). If Mr. Bendawald was not the "prowler" then there is no relevance to the allegation, let alone the "high probative value" the government professes. Far from being "eerily similar" to the conduct alleged in the indictment as the government suggests, the actual circumstances indicate routine police activity where Mr. Bendawald's only sins were wearing a black hoodie and offending Mr. Rohrback's "cop intuition" (also known as "speculation"). This is hardly a sufficient basis upon which the jury could infer plan or identity or any other permissible purpose under Rule 404(b), and therefore the government should be precluded from presenting Mr. Rohrback's speculation as

if it were evidence.

Indeed, stripping away the government's innuendo about a "prowler" and just looking at the facts in the government's own discovery, it is not clear what the jury is supposed to infer from this episode. The government asserts it is evidence of a "modus operandi," Mot. at 15, but that modus operandi boils down to "being around someone's house at night wearing plain clothes." Not exactly distinctive, or evidence of a "plan" or "preparation." The government does not attempt to tie the activities of the "prowler" to the Alleged Victims or even suggest that they had anything to do with any other women. What the caller described sounded very much like a burglar who got spooked, not a police officer using his power to secretly solicit sexual favors.

The government ultimately fails to provide a compelling reason why the parties should spend limited trial time asking the jury to determine whether an individual glimpsed for a few seconds by a pizza delivery driver (an event that has no connection to any count of the indictment) was actually Mr. Bendawald. The government's latest outlandish and unsupported claim is the quintessential kind of tangential, non-probative, and prejudicial allegation that Rule 403 was created to exclude. Presenting evidence of this wholly unrelated incident risks confusing the issues, misleading the jury, and wasting time. If the government is allowed to present this misleading allegation, Mr. Bendawald will be required to play the 911 call for the jury so that it knows exactly what the reporting party claimed, she would be called to testify on the matter as to what she saw and the description of this individual, and Mr. Bendawald would have to go through in painstaking detail every minute of the computer-aided dispatch report and the recorded radio logs to defend against this inflammatory and unduly prejudicial claim. In short, a trial-within-a-trial would be required.

And for what? The jury is ultimately called upon to determine whether Mr. Bendawald

solicited, accepted bribes from, or sexually assaulted the women identified in the indictment. Holding a mini-trial on the identity of the "prowler" on November 2, 2021 does nothing to help the jury resolve the central questions in the trial.  It is simply another effort by the government to unduly prejudice Mr. Bendawald in the eyes of the jury through insinuation, rumor, and speculation rather than taking on its burden to prove beyond a reasonable doubt that the events alleged in the indictment actually occurred.  The Court should shut the door on the government's request to waste time chasing a ghost from nearly four years ago.

**B.    Mr. Rohrback's Non-Probative Allegation Regarding GPS Tracking Should be Excluded from Trial.**

The government asks the Court to allow it to present evidence that in 2020 Mr. Bendawald instructed Mr. Rohrback to disable the GPS tracking in his patrol vehicle as part of a jurisdictional dispute with the Canyon County Sheriff's Office.  Mot. at 16.  It is not clear why it is relevant that Mr. Bendawald allegedly instructed Mr. Rohrback to disable his GPS for purposes of conducting a *police investigation*.  The government speculates that Mr. Bendawald disabling his GPS tracking explains how Alleged Victim 1 was assaulted late at night on the side of the road south of Caldwell with her friend in the car with no other officers stopping by, but it ultimately presents no evidence that the officer who allegedly pulled Alleged Victim 1 over had his GPS tracker off.   The government is simply speculating.  Proof of conduct on one occasion does not constitute a "modus operandi" if there is no evidence that the conduct occurred on the occasion at issue, and thus there is no proper purpose for the evidence under Fed. R. Evid. 404(b).  The government is, once again, attempting to portray Mr. Bendawald as a "bad cop" and hoping that the jury will go along with them for that reason.  Further, the government implicitly recognizes that any GPS evidence is only relevant for Count One, which is the only count in the indictment for which there is no documentation whatsoever that Mr. Bendawald ever encountered the Alleged Victim.

The Court should also preclude the government from bolstering its speculation because it has minimal probative value, while the risk of unfair prejudice is significant.  The government's theory behind admission of this evidence is that Mr. Bendawald sought to conceal what he was doing from his fellow CPD officers.  It is therefore not clear how evidence that Mr. Bendawald *told another officer* about his "secret" scheme to avoid detection advances that inference.  The manifest purpose of this evidence must be to unfairly prejudice Mr. Bendawald and paint him as a "bad cop," purposes that are forbidden by Fed. R. Evid. 403.

The Court should therefore also exclude this minimally probative evidence that risks unduly prejudicing Mr. Bendawald.

## IV.    The Government's Motion to Exclude Self-Serving Hearsay is Premature.

As noted in Section I, Mr. Bendawald recognizes the operation of Fed. R. Evid. 801(d)(2) with respect to his statements.  However, as the government has only identified the recordings of Mr. Bendawald's calls with Mr. Cardwell as the statements it wishes to admit (and them in their "entirety"), Mot. at 9, and states in its Motion that it is leaving itself the option to introduce other statements, *Id.* at 18, it is premature for the Court to issue any order in limine with respect to the defense offering Mr. Bendawald's statements.  Until the government actually offers an excerpt of Mr. Bendawald's statements, the Court cannot know what other statements of Mr. Bendawald's might be necessary to fairly present the entire statement under Fed. R. Evid. 106.  Likewise, the government does not identify any specific statement of Mr. Bendawald's that it wishes to exclude, so it is not clear whether the statement may be admissible for other purposes, such as a written or verbal act, effect on the listener, or a recorded recollection, to name a few.  Because the government's motion essentially just restates the rule without giving the Court a circumstance or piece of evidence to apply it to, there is no need for the Court to rule at this time.

**V.    The Court Should Deny the Government's Request to Exclude All Personal Information About Mr. Bendawald and Mr. Bendawald Will Not Advance the "Jury Nullification" Arguments the Government Seeks to Preclude.**

The government takes an uncontroversial general principle from Fed. R. Evid. 404(a)(1), that a defendant cannot offer evidence he did not commit a crime or did a good act on one occasion to prove that he acted in conformity with good character on the occasion for which he is charged with a crime, and stretches it too far.  The government, without specific citation, would essentially preclude the jury from knowing anything about Mr. Bendawald at all, not even how old he is.  *See* Mot. at 21.  Fed. R. Evid. 404(a)(1) prohibits a party from offering character evidence for the purpose of proving that they acted in conformity with that character, it does not prevent the jury from learning that the defendant is a human being.  Defendants routinely provide some limited background about themselves if they choose to exercise their constitutional right to testify, and this Court does not need to rule in limine on the scope of that testimony at this time.  Moreover, details about Mr. Bendawald's life, such as changes in his family circumstances that influenced his career decisions, may be relevant at trial, but that will depend on how the evidence develops.  More broadly, the defense does not intend to argue that the jury should acquit Mr. Bendawald because, for example, he has a daughter, but by the same token if the government's case cannot withstand the jury learning that Mr. Bendawald has a daughter, then it has not met its burden of proof in any event.

The government also argues that the Court should preclude the defense from introducing evidence of specific instances of Mr. Bendawald's good reputation through a character witness.  Mot. at 22-23.  The government's motion essentially just restates Fed. R. Evid. 405(a), so the Court need not rule now until such character witnesses, if any, are called at trial.  The government does mention two pieces of evidence, an award or a positive evaluation, but only within the context of the testimony of a character witness seeking to support their testimony of Mr. Bendawald's

character through specific instances.  The Court need not rule that such evidence is broadly inadmissible, as it may be relevant for other purposes.

With respect to the government's argument regarding jury nullification, Mr. Bendawald does not intend to argue at trial that he should not be convicted on any of the three bases identified in the government's Motion in Limine.  *See* Mot. at 26.  Mr. Bendawald's defense is that the alleged incidents did not happen, which is the furthest thing from jury nullification.  The Court should not let the government's claimed concern over jury nullification prejudice Mr. Bendawald from presenting a complete defense.  In particular, evidence regarding the Alleged Victims' criminal conduct and their ties to Caldwell's gangs is not nullification evidence, it is pertinent evidence in this case that explains Mr. Bendawald's conduct and establishes a motivation for the Alleged Victims to fabricate claims against him.

**VI.    The Defense Will Not Question the Government's Motivations or Exercise of its Prosecutorial Discretion, but Must Be Able to Challenge the Government's Investigation and Question Government Witnesses for Bias and Motivation.**

The government appears to base its concern that Mr. Bendawald will question its motives for bringing this case primarily on arguments advanced in Mr. Bendawald's Motion to Dismiss Counts Two, Four, Five, Six, and Seven of the Indictment, Dkt. No. 54, that bribery counts exceeded the government's authority under 18 U.S.C. § 666(a)(1)(b).  *See* Mot. at 26.  Needless to say, Mr. Bendawald does not intend to advance statutory construction and federalism arguments in front of the jury.  But there is a difference between challenging the government's exercise of its prosecutorial discretion and questioning government witnesses regarding the conduct of the government's investigation and presenting evidence of their bias.  The former is precluded, but the latter may be part of a complete defense presentation, and the Court should not limit the latter.

Although the government argues that its motivations for bringing this charge against Mr. Bendawald should not be challenged in front of the jury, the Court should not extend that

protection farther than necessary.  After all, even a robust defense of a case on the merits might

cause jurors to question why the government brought the case in the first place.  More importantly,

criticism of the government investigation should not be confused with a challenge to the exercise

of the prosecutor's discretion.  The defense may always "attack the thoroughness, and even good

faith, of the investigation" if there is an evidentiary basis for doing so.  *United States v. Howell*,

231 F.3d 615, 625 (9th Cir. 2000) (citing *Kyles v. Whitley*, 514 U.S. 419, 443 (1995).  Indeed, the

government has a "duty to disclose evidence of a flawed police investigation," which may be

"textbook examples of impeachment evidence." *Id*.  Questioning the conduct of the investigation

is separate from and should not be precluded on the basis that questioning the prosecutor's exercise

of their prosecutorial discretion before the jury is prohibited.[5]

     The Court should also not limit questioning on this basis into the motivations of *witnesses*,

which may include government investigators and other law enforcement.  "Bias is a favored form

of impeachment which may be proven by extrinsic evidence."  *United States v. Silva*, 995 F.2d

234, *4 (9th Cir. 1993).  As one of the cases the government cited for the proposition that a

defendant should not be permitted to inquire into the "overall propriety" of the government's

---

[5] One of the government's citations to Mr. Bendawald's Motion to Dismiss pertains to a footnote where Mr. Bendawald noted the government appeared to pass the case off to Ada County prosecutors because there was a lack of a federal jurisdictional hook to the case until the government developed its expansive theory of jurisdiction under 18 U.S.C. § 666.  Mot. at 27. However, the government has signaled that it intends to present evidence that on June 28, 2021, FBI Agent Doug Hart informed CPD Chief Frank Wyant that "the federal investigation . . . was being referred to prosecutors."  Gov't Resp. to Def. Mot. in Limine at 8, Dkt. No. 150.  If the government chooses to present this evidence, it would be fair for Mr. Bendawald to point out that the "prosecutors" Agent Hart was referring to were not federal prosecutors, but Ada County prosecutors.  The government's theory is that, rather than being a coincidence, Mr. Hoadley and Mr. Bendawald's meeting with Mr. Hessman the next day was prompted by this call with the intent to prevent Mr. Hessman from further cooperation.  But the fact that the "prosecutors" were not federal prosecutors could suggest the opposite inference: that the federal investigation was ending, and there would therefore be no reason to "influence" Mr. Hessman.  Thus, the fact the government was prepared at one point to hand the case over to State authorities could become relevant.

investigation stated, such prohibitions do not impair "the defendant's right to 'impeach the veracity of any Government witness through cross-examination,'" and permitted "the 'proposed exploration of such witnesses' motives and veracity.'" *United States v. Reese*, 933 F. Supp. 2d 579, 584 (S.D.N.Y. 2013) (quoting *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004)).[6]  The Court should therefore not prohibit questioning where there is a basis to conclude a government agent might be biased or have an improper motive in the conduct of the investigation.

The cases the government cites are inapposite to these matters, as Mr. Bendawald does not intend to challenge the government's exercise of its prosecutorial discretion. *See Wayte v. United States*, 470 U.S. 598, 607-10 (1985).  Mr. Bendawald does not intend to suggest that the government improperly exercised its prosecutorial discretion for a discriminatory purpose, *Church of Scientology of Cal. v. CIR*, 823 F.2d 1310, 1321 (9th Cir. 1987), to selectively charge one of two offenders, *United States v. Re*, 402 F.3d 828, 832-33 (7th Cir. 2005), as part of a "perjury trap," *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997), or to politically persecute activists for Puerto Rican independence, *United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984).

The Court should therefore not prohibit evidence or questioning that challenges the conduct

---

[6] The "overall propriety" of the government's investigation language came from *United States v. Demosthene*, which specifically meant to preclude "any discussion of the reasoning behind the Government's decision to supersede its original indictment," and the "law enforcement agent's state of mind during the course of the investigation." 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004). The *Demosthene* court cited to a Second Circuit decision, *United States v. Reyes*, 18 F.3d 65, 71 (2d Cir. 1994), for this proposition. Notably, the *Reyes* court held that *the government's* mode of questioning its case agent to solicit information about their state of mind when conducting the investigation was improper. *Id*. It is thus not clear that *Reyes* supports the holding in *Demosthene*, especially where the Second Circuit observed that evidence challenging the investigation could be admissible, where the defendant had imputed bias or suggested that the case agent had fabricated evidence. *Id*. Nothing in *Reyes* suggests that a defendant should be prohibited from exploring the bias and motivations of government agents and questioning the conduct of their investigation.

of the government's investigation or prevents questioning of a government witness's biases or motivations, which are proper avenues of questioning that do not require challenging the exercise of the prosecutor's discretion.

**VII.    Mr. Bendawald Does Not Object to Some of the Proposed Protection for Witnesses, but Must be Able to Question the Witnesses and Present Evidence Regarding Their Criminal Conduct and Gang Affiliation.**

The government begins this section of its Motion with an attack on the defense team's conduct. Mot. at 29-32. This section was copied and pasted in substantial portion to become the government's Emergency Motion for Appointment of Counsel, Dkt. No. 141. The parties have thus already litigated these matters, and rather than rehash them Mr. Bendawald incorporates his Response to the Emergency Motion, Dkt. No. 147. Suffice to say, the defense disagrees in the strongest terms that it has harassed or inappropriately contacted any Alleged Victim, or that they need to be protected from the defense. That said, Mr. Bendawald does not object to the following procedures suggested by the government:

1. The redaction of transcripts and exhibits that include an Alleged Victim's full name, identifying information, or cooperation with law enforcement, at the conclusion of the case. It is not clear, however, why criminal activity that has already been adjudicated or is the subject of a police report, and is therefore part of the public record, should be redacted or sealed;

2. The first row of seats in the courtroom may be reserved when requested by an Alleged Victim during their testimony.

The government's proposal that the Alleged Victims be allowed to enter the courtroom from a side door closest to the witness stand raises the risk that the jury would see these witnesses being given special treatment and could imply that the Court has determined they were victims entitled to special protections. *See* Def.'s Mot. in Limine at 15-17, Dkt. No. 144 (motion to preclude referring

to the Alleged Victims as "victims").  Accordingly, Mr. Bendawald does not object to this procedure, so long as all witnesses called at trial enter the courtroom through this side door.

With respect to the government's request that the Alleged Victims be allowed to use their first names or initials, this may not be practical during the trial.  This is a multi-alleged victim case where many, if not all, of the Alleged Victims know at least one other Alleged Victim, and where the connections between them through other individuals are a relevant and probative part of the case.  Moreover, many of the witnesses are expected to be current or former CPD officers who also encountered the Alleged Victims in the course of their duties and whose testimony regarding them may be relevant.  Defense counsel cannot ask Mrs. Jones if she knows "X.Y." or simply leave it if she does not know which "Mary" defense counsel is asking her about.  Defense counsel may need to use the Alleged Victims' full names, or present evidence (such as relevant familial relations that demonstrate gang ties or are otherwise relevant) that would reveal their full names. Defense counsel does not propose to do this gratuitously, and is willing to refer to the Alleged Victims themselves by their first names while they are on the stand, but the trial may require more flexibility than a rigid rule that forbids surnames.

A.      References to Drug Use and Gang Membership and/or Association.

Much has been said about victims' rights in this case, and Mr. Bendawald recognizes the Court takes those rights seriously and will take the actions it deems necessary to protect an alleged victim's dignity and privacy to the extent possible in a public trial with public evidence where the alleged victim is subject to cross examination by adversary counsel.  It is the duty of the defense to point out, however, that it is Mr. Bendawald who will be on trial for the rest of his life, and his constitutional rights to due process and to effectively confront the witnesses against him, none more important than the Alleged Victims, are paramount.   The vague, non-binding pronouncements of the statutory Crime Victims' Rights Act cannot be interpreted to conflict with

those constitutional rights.  In trial, the ordinary rules of evidence apply, and Mr. Bendawald must be permitted to pursue a vigorous defense that lays out the Alleged Victims' biases, motivations, and other credibility issues.

These credibility issues include questioning the Alleged Victims about their drug use, criminal conduct, and gang connections and affiliations.  The defense will not do so gratuitously or to suggest that the Alleged Victims are simply "bad" people.  The government attempts to support its request by identifying three times the defense has supposedly used "derogatory" name calling, Mot. at 34, but its citations are misleading.  The defense has referred to several of the Alleged Victims as "criminal gang members."  Def. Ryan Bendawald's Mot. in Limine to Introduce Evid. Pursuant to F.R.E. 412 at 5, Dkt. No. 70.  This is an accurate descriptor.  All of the Alleged Victims have been convicted of multiple felonies, Mot. at Ex. 8, and it is not gratuitous to point this out: the undisputed fact they were involved in criminal activity is why they encountered Mr. Bendawald.  The fact they are criminals is an integral part of the story of this case.  However, the defense has not referred to the Alleged Victims as "hardcore drug addicts" (though all were drug abusers at the time they encountered Mr. Bendawald) or "not well-kept." Mot. at 33.  Although these words appear in a defense filing, Def. Ryan Bendawald's Mot. in Limine to Introduce Evid. Pursuant to F.R.E. 412 at 10-11, Dkt. No. 70, they are a quote from and summary of what an anticipated *government witness* told Alleged Victim 1.  Namely, this witness told Alleged Victim 1 that she should make an allegation, because she was more likely to be believed than another accuser this witness knew of who was a "hardcore drug addict" and not well-kept.  The government has unfairly taken these statements out of context.

With respect to gang membership or affiliation, that too is an accurate descriptor for at least three of the charged Alleged Victims.  The government's objection here is particularly weak,

especially given that when the U.S. Attorney's Office for this district obtained an indictment against Alleged Victim 3 and others it issued a press release identifying them as "members and associates of the West Side Loma gang."[7]   The government's new witness, Officer Rohrback, provided a document to the government describing Alleged Victim 4 as "[a] female gangster . . . out of California [who] was a new player in town, likely with a cartel, or other big player connections," who was "responsible or proximally responsible for a lot of chaos during an already chaotic time during COVID."[8]   Of course, the government need not take Officer Rohrback's word for it, as it could consult with FBI Agent Tsoler Kojayan out of Los Angeles, who sent Mr. Bendawald Alleged Victim 4's field interview card that identified her as a member of the Pico Nuevo gang.[9]   Records obtained by the government also show that Alleged Victim 2's deceased husband was documented in prison as a member of the East Side Locos, a sureno gang in Caldwell,[10] and her brother is also a documented member of that gang.[11]   As Alleged Victim 2 explained to the government, her role was to smuggle drugs into the prison for the gang.  *See* U.S.'s Mot. for an Order Permitting Admission of Evid. Pursuant to Fed. R. of Evid. 413 and 404(b) at 15-16, Dkt. No. 80.

There is therefore more than a good faith basis to explore the Alleged Victims' gang ties, and more importantly to show that Mr. Bendawald had a reason to believe they had gang ties. With respect to Alleged Victims 5 and 7, the evidence will also show their involvement in the

---

[7] This fact illustrates the unworkability of trying to give the Alleged Victims anonymity at trial. Mr. Bendawald cannot cite this document in this filing in any meaningful way without revealing Alleged Victim 3's identity, because she was named in a public press release by the government.
[8] BENDAWALD_043655.
[9] BENDAWALD_FILTER_009741-9744.
[10] BENDAWALD_007227.
[11] BENDAWALD_004418.

DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTIONS IN LIMINE - 21

illicit drug trade and relationships to gang members.[12]  The defense will not explore these ties and the Alleged Victims' conduct for the purpose of demeaning them.  These facts are essential to the defense, because they explain why Mr. Bendawald initially encountered these women, why he continued to encounter them, and why he sought information from them: Mr. Bendawald knew they had information about drug activity and other gang members they could provide him.  The government has made very clear that it will characterize Mr. Bendawald's contacts with the Alleged Victims as "harassment" or "stalking," and showing that the Alleged Victims were engaged in criminal activity themselves and had connections indicating to Mr. Bendawald that they would have information on others committing more serious crimes is necessary to rebut the government's allegations.

For the same reason, the fact that several of the Alleged Victims were sources of information for Mr. Bendawald is also of the utmost importance.  Showing that the Alleged Victims gave Mr. Bendawald information, or contacted him for the purpose of giving him information, provides an innocent explanation for why Mr. Bendawald may have had multiple or repeated contacts with the Alleged Victims.  In addition, the government will introduce evidence that Mr. Bendawald requested that prosecutors give consideration on behalf of Alleged Victim 2, with the implication that Mr. Bendawald was fulfilling his end of a corrupt bargain for sexual favors.  Evidence that Alleged Victim 2 actually gave Mr. Bendawald useful information on others is therefore critical to demonstrate that the benefits she may have received were the result of her cooperation with law enforcement, not a sexual bribe.  The defense is cognizant of the Court's interest in protecting informants, but there is simply no way to fairly try this case without giving

---

[12] Alleged Victim 1 is, as always, the outlier.  The defense does not have information tying her to Caldwell's gangs, although she has multiple drug felonies.  She is also the only Alleged Victim Mr. Bendawald has never investigated and never been involved in a documented arrest of.

the jury a full understanding of Mr. Bendawald's law enforcement contacts with the Alleged Victims, which will include the Alleged Victims promising to give him information, exploring the possibility of being sources of information, and ultimately giving him information about others' criminal activity.  In the terms of Fed. R. Evid. 403, the probative value of this evidence goes well beyond any risk of unfair prejudice, and defense counsel should be permitted to refer to these matters in argument as well as through the evidence.

The lone case the government cites does not stand against this conclusion.  This is an unusual case, where the government finds itself in the position of citing defense-friendly cases to try to shield its criminal Alleged Victims (one of whom the government itself prosecuted) from being questioned about their criminal activity.  But it is not at all clear that a case holding that "[a] *defendant's* guilt may not be proven by associating him with unsavory characters," *United States v. Dickens*, 775 F.2d 1056, 1058 (9th Cir. 1985), has much to do with this case, where the defense is seeking to introduce probative evidence not for impeachment or credibility purposes, but to explain the conduct that forms the core of the indictment.  Indeed, the Ninth Circuit in *Dickens* observed that the government in that case did not even contend that evidence the defendant was part of the mob "has any probative value in proving commission of the crimes charged." *Id*.  The evidence was solely for impeachment and credibility purposes. *Id*.  As demonstrated above, that is not the case here.  To restate the Fed. R. Evid. 403 balancing test in plain terms, the Court should not prevent Mr. Bendawald from introducing highly probative evidence just because putting that evidence in front of the jury might also make the government's witnesses look bad.

### B.    Cross Examination of the Alleged Victims.

The government recognizes the importance of effective cross examination to Mr. Bendawald's right to a fair trial.  Mot. at 35.  "There are few subjects . . . upon which [the Supreme Court and other courts have been more nearly unanimous than in their expression of belief that the

right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405 (1965).  As such, "arbitrary or disproportionate restriction on a defendant's ability to cross-examine adverse witnesses as to their biases or motives for testifying violates the Sixth Amendment." *Ortiz v. Yates*, 704 F.3d 1026, 1035 (9th Cir. 2012).  The government proposes no specific limitations on that cross examination except that the Court should protect the Alleged Victims from cross examination that is harassing, confusing, or overly prejudicial.  *Id*.  It is not clear what the government is requesting beyond the general application of Fed. R. Evid. 403 and the Court's power under Fed. R. Evid. 611(a) to control the mode of examination.  Because the government requests no specific relief, there is no need for the Court to issue an order respecting the mode of cross examination.

### C.    Mental Health Records.

The government seeks to preclude the defense team from questioning Alleged Victim 7 regarding medical records that diagnose her with schizophrenia.  Mot. at 36.  For background, the medical records the government cites to relate to an incident in August 2015 that the government has noticed its intention of introducing pursuant to Fed. R. Evid. 413, where Alleged Victim 7 was pulled over by Mr. Bendawald and had a seizure before being transported to the hospital.  U.S.'s Mot. for an Order Permitting Admission of Evid. Pursuant to Fed. R. of Evid. 413 and 404(b) at 17, Dkt. No. 80.  Therefore, even if Alleged Victim 7 was not exhibiting symptoms during her arrest in March 2021 (though it is not clear what those symptoms might be, given that schizophrenia is a mental disorder and thus the symptoms occur within the individual's mind), her schizophrenia diagnosis may be relevant with respect to the August 2015 incident where her diagnosis was noted.  Alleged Victim 7's diagnosis may also become relevant if the government's expert, Shannon Sorini, LCSW, testifies consistent with the government's notice that various

mental health symptoms are indicative of sexual abuse, at which point the defense would be entitled to present evidence of Alleged Victim 7's mental health diagnoses to refute that inference. In other words, it is premature at this time to determine whether Alleged Victim 7's mental health diagnoses will be admissible at trial.

## VIII.    The Alleged Victims' Criminal History.

The government recognizes that the Alleged Victims' prior convictions within the last ten years must be admitted to impeach them under Fed. R. Evid. 609(a)(1)(A).    With respect to convictions older than ten years, Mr. Bendawald may seek to admit evidence of one of Alleged Victim 3's convictions where the government has not agreed to admissibility:

Alleged Victim 3's conviction for possession of controlled substances, which is listed as 3.A in Appendix One of the government's Motion in Limine.  The date on the government's chart of April 6, 2015, represents the date judgment was entered against Alleged Victim 3.  It is therefore only outside of the ten-year window for purposes of Fed. R. Evid. 609(a) by five months.  More importantly, the government agrees that "offenses investigated by the Defendant are admissible and important, relevant information for the jury to determine guilt—regardless of the nature of the conviction or class of offense."  Mot. at 40.  The conviction at 3.A was investigated by Mr. Bendawald.[13]  Accordingly, Mr. Bendawald should be permitted to present evidence regarding this conviction and the underlying facts, because as the government recognizes, offenses where Mr. Bendawald investigated the Alleged Victim and that contact resulted in a criminal conviction are particularly important, and thus the probative value of the conviction and its circumstances substantially outweighs its prejudicial effect under Fed. R. Evid. 609(b)(1).

Mr. Bendawald also recognizes that Fed. R. Evid. 609 does not permit evidence about the

---

[13] *See* BENDAWALD_016626.

circumstances of the conduct underlying the conviction when the fact of the conviction is what impeaches the witness. The underlying facts of a prior criminal offense may still be admissible under Rule 404(b), if they are relevant for some proper purpose. *See United States v. Cruz-Garcia*, 344 F.3d 951, 956-57 (9th Cir. 2003) (reversing conviction where district court improperly excluded evidence of conduct underlying conviction that had been admitted for impeachment purposes under Fed. R. Evid. 609). To that end, the Court should not rule unequivocally at this point that underlying conduct cannot be admitted, as it may become relevant at trial depending on the testimony of the Alleged Victims and the government's arguments. This case is atypical in the sense that it is largely about the Alleged Victims' interactions with a police officer, which by necessity implicates their criminal conduct. If evidence is relevant and its probative value is not substantially outweighed by the risk of unfair prejudice under Fed. R. Evid. 403, then presenting that evidence is not "harassment" of the Alleged Victims.

One instance of underlying conduct that the defense may intend to elicit evidence of at trial relates to Alleged Victim 1. In particular, the conviction identified in Appendix One of the government's Motion as I.E for burglary. The underlying facts of this case are that, in Ada County, in September 2016, Alleged Victim 1 shot her live-in boyfriend who was the father of her two children. The case was not immediately prosecuted, because Alleged Victim 1 claimed the shooting was an accident: the gun had gone off as she was taking some jeans down from a shelf and her boyfriend was sleeping. The State's investigation ultimately provided reason to believe Alleged Victim 1 had intentionally shot her boyfriend, perhaps intending to kill him, on the theory that she was in another relationship.

Mr. Bendawald does not intend to introduce all of these facts; they are provided for the Court's benefit. What is more important about this charge is its timing relative to Count One and

what was at stake for Alleged Victim 1.  It was not until September 2017, a year later, that Alleged Victim 1 was charged with burglary, on the theory that she entered the room where her boyfriend was sleeping with the intent to commit a crime.  In the meantime, Alleged Victim 1 claims that Count One occurred in July 2017.  It is a fair question, then, why Alleged Victim 1 did not come forward with her allegation when she was potentially facing attempted murder charges and might have obtained consideration in her case for disclosing serious misconduct by a police officer in a different jurisdiction.[14]  At this time, the individual who was allegedly with Alleged Victim 1 on the night in question and would have witnessed the assault and who according to Alleged Victim 1 was also assaulted, was still alive and could have corroborated Alleged Victim 1's claims. Alleged Victim 1 would of course be free to offer any explanation for why she did not disclose, but the jury is entitled to evaluate her response, especially in light of the evidence that Alleged Victim 1 disclosed her allegation over a year after the investigation began, when the allegations against Mr. Bendawald were well-known in the community, where she was facing new charges and facing a parole revocation hearing, and where she was being urged to disclose by a friend because of the benefits she would receive, including custody of the children she lost because she shot their father.  The circumstances of the offense, which establish the stakes for Alleged Victim 1, are therefore relevant for a purpose beyond the mere fact of the conviction.

The government also notes that the defense produced evidence relating to crimes of the Alleged Victims other than ones Mr. Bendawald investigated and asks that this information be excluded, but it does not identify any particular evidence that should not be admitted.  Mr. Bendawald produced evidence of the Alleged Victims' other police contacts because they are

---

[14] Indeed, the sentencing judge stated his belief based on the information he had that Alleged Victim 1 intentionally shot her boyfriend and that it was a fair inference she was guilty of attempted murder.

relevant to a pertinent issue at trial. For instance, if the government advances the argument that only Mr. Bendawald acted a certain way towards an Alleged Victim, or that what he did was unusual for a CPD officer, the defense should be entitled to introduce evidence that another officer did the same thing or acted the same way towards an Alleged Victim. The evidence may also be relevant for other purposes, but because the government has not identified specific evidence it wishes to be excluded, the Court should wait until trial to rule on this issue, when the relevance of other criminal conduct can actually be assessed.

## IX.    Neither Defense Expert Will Invade the Province of the Jury.

The government partially objects to the testimony of Dr. Cara Laney and does not object to the testimony of Brian Holland, though it proposes that certain cautionary instructions accompany his testimony.

The government's sole objection to Dr. Laney's testimony is that she "cannot testify to her conclusions that a specific witness's memory is false." Mot. at 41. Dr. Laney will not offer such an opinion at trial. The government points to only two short excerpts from Dr. Laney's report, where Dr. Laney opined that (1) some of the Alleged Victims made accusations against Mr. Bendawald only after they were suggestively interviewed by the government; and (2) some of the Alleged Victims *may have* false memories or made a false confession. In neither case will Dr. Laney state her opinion that any Alleged Victim has false memories or made a false confession. Dr. Laney, applying her scientific expertise in the area of human memory, will identify for the jury conditions that may bring about false memories and/or false confessions and identify where those conditions exist in this case. Dr. Laney has not examined the Alleged Victims and will not opine that the presence of these factors means their memories or statements are false, it will be up to the jury to decide what to do with the evaluative tools Dr. Laney gives them.

The government has no objection to Brian Holland's testimony. Mr. Holland will not be

DEFENDANT'S RESPONSE TO GOVERNMENT'S MOTIONS IN LIMINE - 28

called to identify whether any of the Alleged Victims are gang members, he is called as, in the government's terms, a subject matter expert in the area of gangs and gang investigation. The government asserts that a cautionary instruction and bifurcation is required because of Mr. Holland's dual role as an expert and a fact witness. The government cites to multiple cases, which are also cited in the commentary to the Ninth Circuit Model Criminal Jury Instructions, 3.15, that involved government agents involved in the investigation of the criminal offense that were also called to testify as experts. *See United States v. Anchrum*, 590 F.3d 795, 798 (9th Cir. 2009); *United States v. Holguin*, 51 F.4th 841, 862-63 (9th Cir. 2022); *United States v. Vera*, 770 F.3d 1232, 1246 (9th Cir. 2014); *United States v. Torralba-Mendia*, 784 F.3d 652, 659 (9th Cir. 2015). But that is not the case here, and it is not clear that the protections required by these cases, which inure to the defendant, are required where the defendant is the one sponsoring the witness.

In any event, this is a matter for the parties' proposed jury instructions and does not bear on the admissibility of Mr. Holland's testimony, which the government does not challenge.

## CONCLUSION

For the foregoing reasons, Mr. Bendawald requests that the Court deny the government's Motions in Limine where Mr. Bendawald objects the relief requested.

DATED this 11th day of August, 2025.

NEVIN, BENJAMIN & McKAY LLP

/s/ Debra Groberg
Debra Groberg

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of August 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

    Katherine L. Horwitz
    United States Attorney's Office
    khorwitz@usdoj.gov

                /s/ Debra Groberg
                Debra Groberg