UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br>v.<br><br>RYAN A. BENDAWALD,<br><br>                          Defendant. | Case No. 1:23-cr-00281-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are omnibus Motions in Limine filed by the Government (Dkt. 140) and Defendant Ryan A. Bendawald (Dkt. 144), as well as Bendawald's Motion in Limine to Exclude Expert Testimony of Shannon Sorini (Dkt. 143). Having reviewed the record and the briefs, the Court finds that the facts and legal arguments are adequately presented and will decide the Motions without oral argument.[1]

Upon review, and for the reasons set for below, the Court GRANTS in PART and DENIES in PART the parties' omnibus Motions in Limine and DENIES Bendawald's Motion in Limine to Exclude the Testimony of Shannon Sorini.

## II. BACKGROUND

Bendawald is a former Sergeant of the Caldwell Police Department ("CPD") in Caldwell, Idaho. The Government's investigation into the CPD began in December 2020,

---

[1] *See* Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B) and Dist. Idaho Loc. Crim. R. 1.1(f) (incorporating the local civil rules when no applicable criminal rule is present).

after two officers complained to the FBI about then-Lieutenant Joey Hoadley and then-Sergeant Ryan Bendawald. As part of that investigation, the FBI interviewed several women (the "Alleged Victims") who had been arrested or otherwise contacted by Bendawald during his policing duties. Several of those women told the FBI that Bendawald had committed sexual misconduct during their encounters.

On October 11, 2023, a federal grand jury indicted Bendawald on two counts of felony deprivation of rights under color of law, one count of misdemeanor deprivation of rights under color of law, and five counts of federal program bribery. Dkt. 4.[2]

In preparation for trial, the Government filed a Motion in Limine with nine requests. Dkt. 140. Bendawald has filed his own Motion in Limine with nine requests. Dkt. 144. Bendawald also filed a separate motion in limine[3] to exclude the testimony of one of the Government's proffered experts. Dkt. 143. Briefing on the various motions is now complete, and the matters are ripe for review.

### III. LEGAL STANDARD

"Motions in limine are well-established devices that streamline trials and settle evidentiary disputes in advance, so that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Miller v. Lemhi Cnty.*, 2018 WL 1144970, at *1 (D. Idaho Mar. 2, 2018) (citing *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). "The term 'in limine' means 'at the outset.' A motion in limine is a

---

[2] The Court recently dismissed Count Six of the Indictment upon Motion by the Government. Dkt. 163, at 44–45.

[3] As outlined below, the Government also challenges two of Bendawald's experts in certain limited respects but included these objections in their omnibus motion.

procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009) (quoting Black's Law Dictionary 803 (8th ed. 2004)).

Because "[a]n in limine order precluding the admission of evidence or testimony is an evidentiary ruling" *United States v. Komisaruk*, 885 F.2d 490, 493 (9th Cir. 1989), "a district court has discretion in ruling on a motion in limine." *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991). Further, in limine rulings are preliminary and, therefore, "are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

## IV. ANALYSIS

As both sides note, some of their requests likely cannot be decided at this stage—at least fully—because so much depends on the evidence and testimony that is presented at trial. The Court will rule on what it can today and provide additional guidance in the hopes of streamlining matters before, and during, trial. However, should the evidence and testimony presented at trial materially affect any of the Court's rulings herein, either party can raise such issues *outside* the presence of the jury.

### A. Government's Motion in Limine (Dkt. 140)

The Government moves the Court for an order admitting three evidentiary matters, and precluding Bendawald from discussing six other areas of evidence at trial. Bendawald agrees with some of the Government's requests.

On the admissions side, the Government seeks to admit: (1) two recorded phone calls between Bendawald and another officer during which they discussed the investigation

into CPD; (2) summary exhibits of phone and custodial records; and (3) two instances of "other act" evidence under Federal Rule of Evidence 404(b).

On the preclusion side, the Government seeks an order from the Court precluding Bendawald from introducing evidence related to any of the following: (4) Bendawald's self-serving hearsay; (5) Bendawald's good acts; (6) the Government's motivation in bringing this case; (8) evidence of the Alleged Victims' other convictions; and (9) expert testimony from Brian Holland and Dr. Cara Laney that would invade the province of the jury. The Governments also requests that the Court employ certain procedures to: (7) avoid any harassment or disparaging of the Alleged Victims during trial.

Bendawald begins his response by noting some of the Government's requests are little more than admonitions or reminders about the Rules of Criminal Procedure or the Rules of Evidence and contends he intends to follow all rules. The Court expects both sides to follow all rules. Otherwise, Bendawald generally agrees with the Government on a few requests. He also agrees in principle with others requests but maintains his right to see how the evidence unfolds at trial. There are three areas, however, that are squarely in dispute: (3) the two other acts; (8) evidence of the Alleged Victims' other convictions; and (9) the scope of expert testimony.

The Court will outline the agreed-upon—and semi-agreed-upon—areas first. It will then turn to the three disputed topics.

### 1. Two Recorded Phone Calls

The parties have reached an agreement whereby the two recorded phones calls at issue in the Government's first request will be redacted to exclude references to

Bendawald's alleged sexual relationship with a minor. Otherwise, the parties agree these calls are admissible as party opponent statements under Fed. R. Evid. 801(d)(2).

### 2. *Summary Exhibits etc.*

Bendawald does not object to the Government's second request as to the admission of his phone records on December 3, 2018, or the admission of the custodial records for the Alleged Victims. He also does not object to authenticity of any other call records, but reserves the right to object under other applicable rules, if necessary. He further asks that any summary exhibits exclude the use of the word "victim," but otherwise does not object.

### 4. *Bendawald's Self-serving Hearsay Statements*

Consistent with his representations as to the two recorded calls, Bendawald confirms he understands how Rule 801(d)(2) operates with respect to any of his statements. He notes, however, that the Government has not identified any other statements beyond those involved in the phone calls previously discussed. Thus, he agrees to follow Rule 801, but maintains he cannot agree to anything further until he knows what self-serving statements or evidence the Government seeks to exclude.

### 5. *Bendawald's Good Acts and Jury Nullification*

Again, Bendawald agrees that Federal Rule of Evidence 404(a)(1) does not allow him to generally introduce evidence of his good character. However, he contends the Government's sweeping motion would essentially prohibit him from telling the jury about his family, his life, and even his age. The Court agrees that the Government's brief on this topic is a little overbroad. *See, e.g.,* Dkt. 140, at 21. Some personal facts may be relevant to understand Bendawald's career, his job duties, and things of that nature. But the Court

cannot say at this stage whether certain topics are wholly allowed or wholly off-limits because the evidence has not been presented and/or may depend on whether Bendawald, himself, testifies. Specific objections will be dealt with at trial.[4]

The Government also goes so far as to assert that Bendawald may try and use such character evidence to induce jury nullification.[5] Bendawald has confirmed he does not intend to engage in any jury nullification or present arguments that he has been punished enough for his misconduct, the federal government should not meddle in state affairs, or the Alleged Victims got what they deserved.[6]

### 6. *The Government's Motivation in Bringing this Case*

The Government moves the Court for an order instructing Bendawald not to present evidence or argument that the Government unfairly prosecuted him or that this case is novel in some way. The Government also appears worried Bendawald may try to sow discord by using the fact that the United States Attorney's Office contemplated passing this case off to Ada County prosecutors early on—ostensibly because they did not know whether there was a sufficient federal jurisdictional hook.

Bendawald agrees he will not question the Government's motivations or the

---

[4] The Government hints that evidence of Bendawald's good character may come in via other witnesses and suggests such should be precluded as well. Bendawald reiterates that evidence of this nature *may* be relevant, but he cannot say at this stage. Regardless, Bendawald maintains he will comply with Federal Rule of Evidence 405 should such evidence play a role at trial.

[5] Jury nullification is when a jury finds a defendant not guilty, although they believe he or she is guilty of the charged conduct, because they disagree with the law or feel the law was applied unfairly or unjustly in the particular case.

[6] As outlined below, Bendawald does seek to discuss the Alleged Victims' criminal history. He may only do so to the extent authorized under the Court's below holding, and consistently with his own affirmation that he will not seek to nullify the jury on this basis.

exercise of its prosecutorial discretion in bringing this case. He maintains, however, that he is allowed to generally challenge the Government's investigation, and to question witnesses about *their* bias or motivation. The Court sees this as a thin line. Questioning a government witness about his or her motivations could very quickly lead to questioning *the Government's* motivations because that witness was likely acting on behalf of the Government. To be sure, Bendawald can discuss the *investigation*, and he is free to question *witnesses* as he sees fit—even regarding the "thoroughness and . . . good faith of the investigation . . . ." *Kyles v. Whitley*, 514 U.S. 419, 445 (1995). But Bendawald is cautioned not to cross the line into questioning "the Government" motivations or prosecution decisions via Government witnesses.[7] Finally, if the fact that the United States Attorney's Office contemplated handing the case off to State Prosecutors becomes relevant at trial, Bendawald must raise this issue with the Court outside of the presence of the jury.

### 7. Procedures for Alleged Victims

The Government seeks to protect the Alleged Victims in this case with various courtroom procedures. These include: (1) using first names or initials; (2) redacting or sealing transcripts and other exhibits that include personally-identifying information about the Alleged Victims; (3) allowing the Alleged Victims to enter the Courtroom from the side door next to the witness stand; and (4) reserving the first row of the gallery (when requested) for the Alleged Victims' family, friends, and support staff (such as a victim witness coordinator). Bendawald does not object to requests two and four. The Court

---

[7] For example, questioning a Government witness about his or her impression of why the investigation was, or was not, handled by federal or state prosecutors would seem to impermissibly touch directly on the Government's prosecutorial decision-making.

approves such procedures.

Bendawald does not object to the Government's first request per se but proffers it may not be practical in a multi-alleged victim case to use only initials or first names. The Court is aware from off-the-record conversations with counsel that they are working with the court reporter on a methodology for referring to the Alleged Victims that will be sufficient for identification purposes but also provide privacy. Thus, the Court will wait to hear from the parties on this front. The Court is willing to do whatever it can to protect the Alleged Victims, *however,* it is paramount that the record be clear. This case is, for lack of a better term, a "he-said, she-said" case. People's identities, relationships, connections, interactions, etc. are critical to the proper prosecution and defense of this case, as well as to preserving a clear record.

Bendawald objects to the Government's third request that all Alleged Victims be allowed to enter the Courtroom from the side door.[8] He postures that this procedure could show special treatment to these witnesses, so unless the Court allows *all* witnesses to enter via that door, he cannot agree. The Court will not allow any witnesses to enter the Courtroom from the side door. As noted in footnote eight, the placement of the door is somewhat unique. If Court staff or the jury are moving to or from the jury room, use of this door could prove problematic. Moreover, the Court agrees with Bendawald that the Government's proffered procedure—even for Alleged Victims and even for something as

---

[8] Neither side clarifies, but the Court assumes the parties are referring to use of the Courtroom's side door when the Alleged Victims *are testifying*. First, the Court will follow its standard procedure of excluding witnesses (unless a unique situation presents itself). Second, the side door the Government is referring to could prove cumbersome to use, as it is situated between the jury box, the jury room, and the clerk's desk.

MEMORANDUM DECISION AND ORDER - 8

simple as entering the Courtroom—could show preferential treatment. The Court denies this request.[9]

Finally, as part of its suggested procedures, the Government asks that the Court prohibit name-calling or aggressive cross-examination of any of the Alleged Victims. It also asks that the Court disallow Bendawald from probing any Alleged Victims' drug use, gang membership, or mental health records.

The Court expects Counsel for both sides to act professionally and not to badger any witness. By "name-calling," the Government is concerned Bendawald might refer to these individuals as "hardcore drug addicts," "gang members," or use other derogatory terms. Bendawald has represented he will not use these terms as derogatory adjectives to describe the Alleged Victims, but that some are appropriate descriptors (e.g. being a "gang member") and should also be allowed in questioning and conversation.[10] Although the Court agrees an Alleged Victim's gang membership or drug use may become relevant depending on how the facts are presented at trial, the Court will not allow Bendawald to *describe* the Alleged Victims by using such terms. And, as for aggressive cross-examination, such is allowed and will likely occur in this case. If either side feels a line of questioning has gone too far, objections can be made and dealt with.

---

[9] The Court typically allows incarcerated witnesses to take the stand *outside* the jury's presence. Such must be requested and approved by the Court. Counsel should orally move for this procedure the morning any such witness will testify.

[10] For example, there is a difference between labeling a person as a "hardcore drug user" and asking that same person if he or she used drugs or even if he or she considered herself a hardcore drug user. The Court is confident Bendawald's counsel knows the difference and will question the Alleged Victims appropriately.

Bendawald can explore the Alleged Victims' general history of drug use and their ties to gangs and criminal activity, to the extent such facts are relevant to his defense. Specifically, he can draw out answers of *general* criminal activity to support his theory that he encountered these women and engaged in communications with them on multiple occasions because they were sources of information in other on-going criminal investigations. Bendawald may not, however, delve into the details of any specific criminal activity, as such could lead to problems with self-incrimination or other confidential law-enforcement activities. However, generally discussing gang-ties and past drug use—if such facts are germane to Bendawald's defense—

will be allowed.

Finally, the Government contends Bendawald should not have carte blanche to cross-examine any of the Alleged Victims about their mental health. But the only specific Alleged Victim who is mentioned by either party is AV7. In sum, AV7's medical records reflect "schizophrenia" as part of her medical history.[11] It is not clear at this time whether that diagnosis will be relevant at trial. The parties should request a hearing outside the jury's presence before such information can be addressed,

The Court next turns to the three areas where the parties are at an impasse.

3. *Other bad acts*

Recently, a former CPD officer—Nathan Rohrback—came forward regarding two

---

[11] The Government argues this information is irrelevant because there is no indication AV7 was experiencing any symptoms of schizophrenia at the time of Bendawald's alleged offense. Bendawald claims however, that, because schizophrenia could result in memory problems, AV7's diagnosis *might* be relevant. He asks the Court to wait to rule on this issue. As outlined above, the Court will wait to see the evidence and testimony before ruling.

experiences he had with Bendawald in 2020 and 2021. The 2020 incident dealt with Bendawald telling Rohrback to turn off his GPS tracker in his patrol vehicle. The 2021 incident involved a report of an unknown subject "prowling" through a neighborhood. Rohrback believes Bendawald was the prowler. The Court will discuss each incident in turn.

As a threshold matter, Bendawald contends this information was disclosed *after* the Court's deadline for Rule 404(b) evidence. This is true. But the evidence did not come to light until *after* deadline. As recently discussed, the Court's deadline was for organizational purposes and was not "meant to be an immovable bar to relevant evidence discovered after the deadline." Dkt. 163, at 42. The timing does not concern the Court.

a. GPS

The first incident is straightforward, as is the resolution. The Government claims Bendawald told Rohrback to turn off his GPS tracker in his patrol vehicle while policing in Homedale, Idaho, to avoid detection. As the Court held in its prior order, "Bendawald's other purportedly bad practices—such as turning off his body camera, policing outside of his jurisdiction, following individuals and contacting their families—could have alternative explanations and are not, in the abstract, necessary to prove the Government's case." Dkt. 163, at 34. That holding rings true here.

There is no indication that Bendawald's request that Rohrback turn off the vehicle's GPS is connected to the present allegations against Bendawald in any way. Furthermore, there is no indication that Bendawald told Rohrback to turn off his GPS for any nefarious

MEMORANDUM DECISION AND ORDER - 11

purpose.[12] And to reiterate, Bendawald is not on trial for general bad policing—even if his bad policing created opportunities for the acts charged in the indictment. The risk of confusion or imputing a bad practice or incident (turning off a GPS) to a much more serious incident (sexual assault) is too great to allow this evidence. Only if Bendawald presents evidence that he would never disable a GPS, take action to conceal his whereabouts, or something of that flavor would the Court allow this evidence in at trial.[13]

### b. The Prowler

The second incident is confusing at best.

On the evening of November 21, 2021, a pizza delivery driver called 911 to report she saw a man come out from behind a house and start running down the street like he was trying to evade observation. He had a gun in his hand, was wearing a black hoodie, and had a face covering. Rohrback was close to the scene and responded to the area of the runner. Rohrback was unable to locate the suspect but pulled over a vehicle he thought was suspicious. Bendawald also responded to the call. When Bendawald arrived at the scene of the traffic stop, he exited his patrol car wearing a hoodie and jeans. Donning his service vest, Bendawald approached Rohrback and offered to take over the situation (as the more senior officer). Rohrback found this "highly suspicious" because Bendawald was not on

---

[12] To be sure, the Court would assume GPS tracking should *never* be turned off—mostly for officer safety. However, there could be reasons of which the Court is not aware that would allow such a practice.

[13] In other words, if the Government is *first* able to establish Bendawald used specific tactics (such as turning off his GPS and patrolling outside of his area) when assaulting victims, then the evidence regarding this incident may be admissible to establish a modus operandi. Until that time, however, the incident will not be admissible simply to illustrate what would otherwise be generally bad policing.

duty.[14] Rohrback felt something was off about the situation and ultimately concluded Bendawald *was* the suspicious prowler the pizza delivery driver reported.

The Court is leaving out some details because the story is, quite frankly, highly disputed. Bendawald has a reasonable explanation for the details the Government deems suspicious, while the Government calls Bendawald's explanations into question. Both sides have evidence to support their theory of these events.[15]

The Court will not allow this evidence in at trial. Whether Bendawald was the prowler is hotly contested, and the Court does not want a mini-trial to determine the identity of the prowler.

The Court understands the Government's argument that Bendawald is accused of showing up unannounced (and at night) at certain Alleged Victim's homes, and that this instance could corroborate that concept and show Bendawald's motion, opportunity, and intent.[16] But with so many questions regarding the incident itself—chiefly if Bendawald was even the suspect—presenting this incident to a jury would risk confusion and cause undue prejudice. The Court will not allow this evidence at trial.

---

[14] That Bendawald was off duty could account for his lack of uniform. Bendawald was also a member of the street crimes unit which did not wear the standard patrol uniform.

[15] Although much of this incident is disputed, it is hard to believe Bendawald was the perpetrator when there is evidence that he was on his computer just two minutes after the 911 call was initiated (when the prowler was presumably still at large). Additionally, the 911 caller stated the prowler was having difficult putting his gun in his pocket. Bendawald was a trained law enforcement officer and a member of CPD's SWAT team. The Court finds it unlikely he would have difficulty securing a weapon. Bendawald also communicated with dispatch and Rohrback prior to arriving on scene. If Bendawald was the prowler, a more prudent approach would have been to quietly leave the area instead of responding to the incident.

[16] That said, by all accounts this incident appears more akin to a robbery or break-in gone wrong than the crimes (or bad acts) of which Bendawald is accused.

8. *Alleged Victims' Prior Criminal Convictions*

The Government outlines that all the Alleged Victims in this case have extensive criminal histories. It recognizes that under Federal Rule of Evidence 609, evidence of prior convictions is admissible to show character and truthfulness. It argues, however, that the Court should limit Bendawald's inquiry into any prior criminal convictions from individuals *he did not investigate*[17] to the mere existence of a criminal conviction and the nature of the crime but otherwise preclude Bendawald from discussing the underlying details. Further, pursuant to the Rule 609, the Government wishes to prohibit any conviction over 10 years old from being admitted.

Generally speaking, Bendawald agrees with the boundaries of Rule 609 and the notion that the underlying facts of the Alleged Victims' prior crimes are not admissible. He argues, however, that there could be another legitimate purpose for introducing this type of evidence. Specifically, Bendawald seeks to introduce the evidence and facts surrounding AV1's conviction for burglary because that charge actually stemmed from an incident where she shot her boyfriend. This situation—like the prowler—is confusing. It appears AV1 claimed to have shot her boyfriend by accident. The subsequent investigation, however, yielded evidence to suggest the shooting was purposeful and could have been charged as attempted murder. As noted, AV1 pleaded to a felony burglary charge. Notably, the sentencing judge in that case believed AV1 was guilty of attempted murder. Dkt. 157,

---

[17] The parties agree the facts underpinning any Alleged Victims' felony convictions that were investigated by Bendawald himself are admissible. Thus, when Bendawald conducted the investigation, both the existence of the conviction and the facts underlying Bendawald's investigation are admissible. The Government has outlined these crimes in an appendix. Dkt. 162-1.

at 27 n.14.

Bendawald states he won't introduce all of these facts and included them in his present brief simply for the Court's benefit.[18] Nevertheless, he postures he should be able to discuss this matter to illustrate that, although AV1 was facing potential murder charges and could have disclosed her allegations against Bendawald in order to receive favorable consideration, she did not report anything about Bendawald during this time. The inference here is a bit of a stretch and boils down to, essentially, this: AV1 is lying about Bendawald's actions because, otherwise, she would have brought them up to avail herself of potential leniency in the burglary/murder situation.

To begin, there are multiple reasons AV1 might not have disclosed her allegations against Bendawald at the time she was negotiating a plea agreement for her criminal conduct. But more importantly, Bendawald can make his point without referencing any of the underlying facts of the shooting incident. It might not be as shocking to omit references to attempted murder, but Bendawald can still ask AV1 why she did not disclose her interactions with Bendawald when it could have benefited her in other serious criminal proceedings.

Finally, Bendawald agrees that convictions over 10 years old cannot come in. However, there is one conviction that misses the deadline by a mere five months *and* is a matter he investigated. He argues the Court should allow this conviction in. As outlined in footnote 18, the Government agrees the underlying facts from offenses Bendawald

---

[18] Bendawald does not, however, identify which facts he would seek to introduce at trial.

MEMORANDUM DECISION AND ORDER - 15

investigated are admissible. The rule is clear, however, that convictions outside the 10-year window are per se inadmissible *unless* the probative value outweighs any prejudice. In briefing here, Bendawald simply states that because the Government agrees that the offenses he investigated are admissible, this particular offense must be admissible as well. Irrespective of the Government's agreement, Bendawald still needs to proffer some reason why this information—which again, is presumptively *not* allowed—should be admissible. If Bendawald elects to try and introduce this conviction at trial, he must first explain its probative value outside of the jury's presence.

9. *Expert Testimony*

Lastly, the Government seeks an order from the Court prohibiting two of Bendawald's expert witnesses—Brian Holland and Dr. Cara Laney—from improperly invading the jury's role at trial. The Court will discuss each in turn.

a. <u>Brian Holland</u>

Holland is a former Boise Police Officer who Bendawald has disclosed will testify as both a fact and expert witness. The Government does not actually object to any of Holland's testimony but asks the Court to either provide a cautionary instruction to the jury, or bifurcate Holland's testimony so it is clear when he is testifying as a fact witness and when he is testifying as an expert witness. The Government claims it would be reversible error for the Court *not* to provide, at a minimum, some instruction to the jury about Holland's testimony—and prefers that the Court bifurcate the testimony altogether to provide a clear demarcation for the jury.

Bendawald contends such protections might not be necessary in this case because

the cases upon which the Government relied to support its assertion that such procedures are necessary were based on dual-role witnesses *the Government* produced. Regardless, he postures this issue can be dealt with via jury instructions.

The Court does not see a meaningful difference between which party produces a dual-role witness. The same concerns identified in the cases the Government cited apply regardless of the party for which the witness testifies. Not only could jurors be confused if a person testifies wearing two hats, but different evidentiary standards apply to certain aspects of expert testimony which do not apply to fact testimony. The Court does not want to risk confusing the jury and utilizing some helpful procedures will not burden or prejudice Bendawald in any way.

In sum, the Court will bifurcate Holland's testimony *and* provide a jury instruction. The bifurcation here does not need to be dramatic. It can be as simple as pausing (or taking a break between the two types of testimony) and reading a short jury instruction that Holland is moving from fact testimony to expert testimony. The parties should be prepared with a short jury instruction the Court can read at the appropriate time.[19]

b.  Cara Laney

Dr. Cara Laney is a psychologist specializing in social behavior. Bendawald has provided notice that portions of Laney's testimony will discuss false memories and false confessions. Laney concluded, as part of her report, that "[s]ome (but not all) of the [the Alleged Victims] made accusations against Bendawald only after they were suggestively

---

[19] The Government has already submitted such an instruction. Dkt. 179, at 2–3. An instruction like this could be read at the end of trial, but a shorter instruction may also be read before Holland's testimony or during the "bifurcation."

interviewed by O'Neil and/or Horwitz." Dkt. 133-3, at 2. The Government asserts Laney can discuss her research and how certain factors correlate or contribute to false memories and confessions, but she cannot offer an opinion about whether the allegations of the Alleged Victims *in this case* were based on false memories because she never examined any of the Alleged Victims.

Bendawald has confirmed that Laney will not testify about any Alleged Victims specifically, but will only discuss her expertise, the science behind her opinions, and what conditions may bring about false memories and/or false confessions, and the jury can then decide how to utilize Laney's testimony with respect to the facts of this case.[20]

With this reassurance from Bendawald, the Government appears satisfied Laney's testimony will be acceptable. Dkt. 162, at 9. So long as Laney does not invade the jury's fact-finding role, her testimony will be allowed.

The Government's Motion in Limine is GRANTED in PART and DENIED in PART as outlined above.

### B. Bendawald's Motion in Limine (Dkt. 144)

Bendawald moves in limine to exclude: (1) testimony related to the Street Crimes use of "Slayer of Month Club" and "DFA Squad" as forms of policing; (2) testimony and evidence related to his consensual sexual relationships with women whom he did not arrest

---

[20] There are, of course, situations in which an expert is allowed to reach a conclusion about the facts of the case based upon his or her expertise. This does not appear to be one of those cases, however, because Laney has not had any interactions with any of the Alleged Victims. Moreover, even when an expert is permitted to give opinions about the facts of the case, he or she cannot invade the province of the judge as to legal determinations and cannot invade the province of the jury as to final factual determinations and, specifically in the criminal context, as to guilt or innocence.

or investigate; (3) his internet search history; (4) Joey Hoadley's conviction for obstruction of justice, harassing a witness, and falsifying records; (5) evidence of his medical records; (6) evidence that he stole drugs and property from arrestees or detainees beyond the victims in this case; (7) reference to the women solicited or assaulted as "victims"; (8) his purported nickname, "Bend-The-Law"; and (9) evidence of the instant Motion or Court rulings.

The Government begins its opposition by noting it *does not* plan to introduce evidence related to five of Bendawald's requests. Specifically, the Government does not intend to introduce evidence or testimony about: (1) the "Slayer of Month Club" and "DFA Squad;" (2) Bendawald's consensual sexual relationships with women whom he did not arrest or investigate; (5) his medical records; (6) drugs and property he seized from arrestees or detainees beyond the victims in this case; and (9) this Motion.

The Government reserves the right to introduce this evidence if it becomes relevant at trial. At present, the Court does not see the relevance and will exclude the same. If the Government believes any of this evidence has become relevant based on testimony at trial, it should ask for a hearing outside the jury's presence before seeking to introduce the evidence.

As for the remaining four topics, the Government contends it *does* intend to introduce evidence and testimony in its case in chief as to each.

3. *Bendawald's Internet Search History*

The Government obtained a search warrant for Bendawald's google email account, which included his internet search history. Bendawald opines the Government could elect to use his internet search history in a variety of ways, and that any mention of his internet

search history is only marginally relevant to the charged crimes and should be excluded.

In response, the Government explains it only plans to offer a specific group of Bendawald's searches related to information on how to forward calls to another phone number.[21] The Government argues this information is directly related to this case and admissible. Specifically, the Government plans to introduce evidence that Bendawald searched "at&t forward calls without phone," "how to forward calls without having the phone," and "if i transfer my calls to another phone, will.it share my location as well."

First, Bendawald contends this evidence falls under Federal Rule of Evidence 404(b) and the Government failed to timely disclose its plan to use it at trial. Because the Government did not clarify what internet searches it planned to introduce until its response brief, it has not had the opportunity to respond to this Rule 404(b) argument raised by Bendawald in his reply.

From its briefing, the Government might view this evidence as intrinsic as opposed to Rule 404(b) evidence. *See* Dkt. 150, at 6–7. It alleges this search happened during the timeframe of the allegations which form the basis for the Indictment and is directly relevant to the charged crimes because Bendawald instructed some of the Alleged Victims to delete messages he sent, put his number in their phone under the alias "Uncle B," or otherwise suggested ways to obscure communications. The Court discussed intrinsic evidence in its prior order. *See* Dkt. 163, at 23. Candidly, this search history does not feel like intrinsic evidence. It is not inextricably intertwined with the charged conduct, nor is it necessary to

---

[21] The Government reserved the right to offer other searches should the evidence and testimony at trial require such. If those situations arise, the Government should alert the Court and opposing counsel so that further rulings can be made outside the presence of the jury.

offer a coherent narrative of the crimes. *See United States v. Vizcarra Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995).

The Court is hesitant to make the above-finding, however, without first hearing from the Government. Thus, it does not formally conclude this evidence is Rule 404(b) evidence which required notice. However, even assuming it was, the Court finds the parameters of Rule 404(b) have been met. As previously discussed, the Court did have a deadline for, among other things, disclosing material that would be offered pursuant to Rule 404(b). That deadline was months ago. But it was not meant to be an immovable deadline; it was meant to keep things organized. The purpose of the notice requirement under Rule 404(b)(3) is to give the defendant "a fair opportunity" to rebuff the other act evidence. Bendawald has clearly had that opportunity as he has responded in opposition to the Government's arguments here.[22]

Second, Bendawald claims the Government has not tied this evidence to any charged conduct. This is partially true. The Government has not said this particular search topic in August 2020 lead to specific actions with specific Alleged Victims. But the implication is clearly there. The Government represents that a CPD Officer will testify Bendawald instructed him to take AV2's cellphone from her after his alleged sexual assault. Multiple victims will also testify about Bendawald's efforts to obscure his communications and theirs. Thus, the information is relevant and will be allowed at trial. Bendawald is, of course, free to discredit this information on cross-examination or

---

[22] The Court would, of course, strongly prefer to have formal notices on the record. But as Rule 404 itself states, notice can happen even during trial (written or orally) if the circumstances warrant that approach.

highlight why his searches could have been for his own personal relationship issues or for clandestine purposes related to his work. But the Court finds the information is relevant and will not prohibit the Government from introducing it at trial.

### 4. Joey Hoadley's Obstruction of Justice and Harassment Convictions

Former CPD Lieutenant Joey Hoadley was Bendawald's supervisor and friend. Hoadley was convicted in 2022 of various obstruction offenses for falsifying a report, wiping his electronic devices before returning them to CPD, and intimidating a witness. Bendawald now seeks an order from the Court prohibiting the Government from discussing Hoadley's convictions *and* conversations he and Hoadley had about the investigation that ultimately led to the charges in this case.

The Government states that while it does not intend to introduce evidence of Hoadley's actual conviction at this time, it may need to do so depending on how the trial evidence unfolds. The Government does, however, contend it should be allowed to discuss statements between Hoadley and Bendawald which indicate they conspired to obstruct and hinder the investigation in this case. The Government argues that, not only are these statements admissible as party-opponent statements under Rule 801(d)(2)(A), but they are co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).

As above, Bendawald agrees his statements are likely admissible as party-opponent statements under Rule 801.

As for Hoadley, Bendawald responds that this is not a conspiracy case. This is true, but the rules permit statements that would otherwise be considered hearsay to be admitted at trial if the Court finds a conspiracy existed between two parties. *See United States v.*

MEMORANDUM DECISION AND ORDER - 22

*Bowman*, 215 F.3d 951, 960–61 (9th Cir. 2000). The Government goes to great lengths to explain how this situation qualifies as a conspiracy. But it does not specifically ask the Court to rule on whether this was a conspiracy or whether the 801 exceptions to hearsay applies as to any specific statement.

The Court does not like to defer ruling, but candidly it is not convinced at this stage that Bendawald and Hoadley were involved in a "conspiracy." It needs to see and hear the surrounding evidence at trial. To be sure, Bendawald and Hoadley discussed in strong terms their disagreement with the investigation and that it was a "witch hunt." Hoadley also ended an internal affairs investigation into allegations that Bendawald had a sexual encounter with Other Victim 3. And, both Hoadley and Bendawald had conversations with others that were forceful (or intimidating by the Government's estimation). But it is hard to decide whether these events amounted to a conspiracy or were just two individuals *strongly*—even overzealously—defending themselves. The Court does not want a mini-trial on conspiracy and can only decide this issue when it sees and hears the context of the proffered statements.

In sum, Bendawald's statements likely come in as party-opponent statements. The Government will need to more clearly demonstrate an exception applies under Rule 801 before the Court will allow Hoadley's statements in during trial. This could be done as part of a proffer outside the jury's presence. Hoadley's conviction is a separate matter as well that can only be dealt with in the context of trial.

8. *Use of the Word "Victim"*

Bendawald next seeks an order from the Court precluding the Government from

using the term "victim" to describe any of the complaining witnesses in this case. He asserts at this point such individuals' claims are just that—claims—and referring to them as "victims" risks biasing the jury. Bendawald presents some cases that support the general idea that use of the word "victim" could be prejudicial.

The Government has agreed to refer to the complaining witnesses in this case by their names and not as "victims." It also, however, asks for some leeway to use the term "victim" in the more colloquial sense if appropriate. In addition, the Government asks that the Court allow it to use the term in closing arguments because it needs to meet its burden to establish Bendawald's guilt. The Government presents some cases that support its position.

When presented with this question a few years ago, Judge B. Lynn Winmill was "unable to find[] any authority holding that references to a complaining witness as a 'victim' violates a defendant's constitutional rights, including the presumption of innocence and the government's burden of proof." *United States v. Moffit*, 588 F. Supp. 3d 1106, 1116 (D. Idaho 2022). Judge Winmill went on to note that other courts—in *nonbinding* jurisdictions—had actually found the opposite. *Id*. at n.3.[23] In a later case, Judge Winmill noted that the issue had been addressed by several courts with "mixed results"—some allowing the term, some prohibiting the term, and some suggesting "alleged victim" is the preferred term. *See United States v. Powell*, 2023 WL 3060708, at *3 (D. Idaho Apr. 24, 2023). In that case, Judge Winmill elected to go with a hybrid

---

[23] Some of the cases cited by the parties in this case pre-date or post-date Judge Winmill's decision. And some of the cases Judge Winmill cited in his decision pre-date or post-date the cases cited by the parties here. In short, there does not appear to be a binding, consistent answer to this question.

approach. The Court finds something similar is appropriate here.

First, this issue can largely be avoiding by using the Alleged Victims' names—as the Government has already offered to do—and consistently with the yet-to-be-finalized approach of using initials and/or first names.

Second, the Court will allow the Government to use the term in the colloquial sense and in questions—for example—about feeing "victimized" or "like the victim of" some offense or conduct. If any other situation calls for a label to be applied to an individual person, the phrase "alleged victim" is preferred.

Third, the Government can use the term "victim" in its closing argument.

Fourth, and finally, the Court would entertain a clarifying instruction if Bendawald feels one is necessary.

9. *Nickname "Bend-the-Law"*

Finally, Bendawald seeks an order from the Court excluding all references to his nickname "Bend the Law." The Government states it does not intend to refer to this nickname during its case in chief, but if Bendawald's character or reputation is discussed, it may be relevant to elicit testimony that Bendawald had such a nickname.

The Court agrees with this approach. As outlined above, this case is not about Bendawald being a bad cop in general, so the relevancy of this nickname is somewhat tangential. But as also alluded to, if Bendawald committed the charged crimes, that would clearly indicate he was a bad cop and bent the law. *See* Dkt. 163, at 34. Thus, for the time being, the Court will not allow evidence of this nickname at trial. However, should Bendawald or any witness discuss his character or reputation for honesty, this information

would likely be relevant and admissible.

Bendawald's Motion is GRANTED in PART and DENIED in PART as outlined above.

### C. Bendawald's Motion To Exclude Testimony of Shannon Sorini (Dkt. 143)

In this Motion, Bendawald seeks to exclude the Government's expert—Shannon Sorini—from testifying at trial. He alleges that pursuant to Federal Rule of Evidence 702, Sorini is not qualified, and her opinions will improperly invade the province of the jury.

Sorini is a Licensed Clinical Social Worker in the Boise area who provides counseling services to a variety of clients, including victims of sexual abuse. Sorini has training and experience in sexual abuse trauma, responses to such abuse, and treatment after sexual abuse, and the Government plans to have her testify on these areas based on her professional experience.

Both sides recognize it is permissible for an expert to testify based on experience—as opposed to scientific knowledge. The Court concurs. That said, Bendawald is concerned Sorini's opinions are essentially that "anything goes" when it comes to sexual abuse, treatment, and trauma, and that such unbounded testimony will not assist the jury. He also feels Sorini's area of expertise is not specific enough to this case.

Under Federal Rule of Evidence 702, expert testimony is admissible only when that expert is qualified, and the opinion is both relevant and reliable. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). As "gatekeepers," district courts must be satisfied: (1) that the expert is qualified to render the proffered opinion; (2) the opinion is reliable; and (3) the testimony assists the jury in its function as fact finder. The

proponent of expert testimony bears the burden of establishing its admissibility. *See* Fed. R. Evid. 702 advisory committee's note (2000) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). A witness may be qualified as an expert based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *see also Thomas v. Newton Intern. Enter*., 42 F.3d 1266, 1269–70 (9th Cir. 1994) ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert."); *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) ("[T]he gatekeeping function is not limited to 'scientific' expert testimony, but applies to all expert testimony.").

Here, in addition to her education and training on the subject matter, Sorini has more than a decade of first-hand experience evaluating and counseling victims of sexual abuse. Through this experience, she has gained expertise on the noticed topics sufficient to satisfy the demands of Rule 702, which itself explicitly recognizes that expertise goes beyond scientific training. *See* Fed. R. Evid. 702 (discussing "scientific, technical, or other specialized knowledge"). The Court thus finds Sorini may testify as an expert.

The Court turns next to Bendawald's two specific objections.

First, it appears Sorini will testify, in part, that multiple things can qualify as symptoms, responses, or expressions of sexual abuse. Likewise, she will testify that trauma response to sexual abuse can manifest in a variety of ways. Bendawald is concerned Sorini's testimony is, in essence, that anything could be considered a symptom of sexual

abuse, that trauma can manifest itself in, essentially, unlimited ways, and that this testimony will all but vouch for the credibility of the Alleged Victims. The idea here is that an Alleged Victim could say anything she wanted about sexual abuse, trauma, responses, or treatment during her testimony, and then if Sorini testifies abuse and trauma can manifest in unlimited ways, such testimony would essentially confirm whatever the Alleged Victim said is true.

The Government has firmly stated that caselaw precludes Sorini from offering credibility testimony, that she will simply testify to her experience, education, and training, and that the jury will then be free to decide how such testimony applies to the facts of this case and to any statements the Alleged Victims made. The Court agrees that so long as Sorini does not specifically vouch for any Alleged Victim in this case, her testimony is permissible and Bendawald can, with vigorous cross-examination, delve into the broadness of Sorini's opinions and why the jury should give them less credence in this case.

Second, it seems the bulk of Sorini's experience has been working with children, not adults. Bendawald argues her opinions are, therefore, less relevant because the Alleged Victims in this case are not children. Sorini claims she has worked with some adult victims of sexual abuse, but it appears those individuals may have been people she worked with since they were children or were adults who were abused *as children*. Regardless, this distinction (if any) is fodder for cross-examination.

The Court's role at this stage is one of gatekeeping. It has reviewed the Government's Notice as well as Sorini's curriculum vitae. Dkts. 130, 130-1. The Court finds the requirements of Rule 702 have been sufficiently satisfied to allow Sorini to testify.

She cannot, of course, invade the jury's purview, but as with Bendawald's expert, Dr. Laney, she can testify to her expertise and leave to the jury the implications of that testimony as the facts of this case and the testimony of the Alleged Victims.

In short, Bendawald's Motion to Exclude Sorini's testimony is DENIED.

## V. CONCLUSION

The Court's holdings above should be followed during trial. If circumstances warrant a change, a party may so move outside the jury's presence. The Court will provide a "cheat-sheet" for ease of reference, but the Court's full-holdings above govern.

Government's Motion in Limine:

- Two recorded phone calls – in (with redactions).
- Summary exhibits – in (without use of the word "victim").
- Bendawald's self-serving hearsay – in (pursuant to Rule 801).
- Bendawald's good acts – out (unless contextually relevant).
- Government's motivation – out (but can question investigation and witnesses).
- Procedures for Alleged Victims:
  - o First Names/Initials – granted (coordinate with court reporter).
  - o Redacting transcripts – granted (coordinate with court reporter).
  - o Use of courtroom side door – denied.
  - o Reserving of first row – granted.
  - o Treatment of Alleged Victims:
    - ▪ Derogatory terms – out (as far as labeling); in (as far as general questioning).
    - ▪ Medical History (AV7) – out at this time.
- Other bad acts:
  - o GPS – out.
  - o Prowler – out.
- Alleged Victims' prior crimes – in (pursuant to Rule 609 and limited as outlined above except in circumstances where Bendawald was directly involved in the investigation).
- Expert Testimony:

- o  Holland – in.
- o  Laney – in.

Bendawald's Motion in Limine:

- Slayer of the Month / DFA squad – out.
- Consensual sexual relationships – out.
- Bendawald's medical records – out.
- Drugs and property from other crimes – out.
- The instant motion and other Court rulings – out.
- Internet search history – in (solely with respect to Bendawald's search regarding obscuring his caller ID).
- Hoadley matters:
  - o  Bendawald's statements – in.
  - o  Hoadley's statements – out at this time.
  - o  Hoadley's conviction – out at this time.
- Use of the word Victim – in (with parameters).
- Nickname – out at this time.

## VI. ORDER

1. The Government's Consolidated Motion in Limine (Dkt. 140) is GRANTED in PART and DENIED in PART as outlined above.

2. Bendawald's Motion in Limine (Dkt. 144) is GRANTED in PART and DENIED in PART as outlined above.

3. Bendawald's Motion to Exclude Testimony of Shannon Sorini (Dkt. 143) is DENIED.

DATED: August 29, 2025

David C. Nye
Chief U.S. District Court Judge