JUSTIN D. WHATCOTT
ACTING UNITED STATES ATTORNEY
KATHERINE L. HORWITZ, OKLAHOMA STATE BAR NO. 30110
FRANCIS J. ZEBARI, IDAHO STATE BAR NO. 8950
ASSISTANT UNITED STATES ATTORNEYS
1290 W. MYRTLE STREET, SUITE 500
BOISE, IDAHO 83702
TELEPHONE: (208) 334-1211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>RYAN A. BENDAWALD,<br><br>　　　　　Defendant. | Case No. 1:23-cr-00281-DCN<br><br>**Government's Response to Defendant's Motion for Sanction (ECF 209)** |

　　　　For the second time in one month, the Defendant asserts that this Court must sanction the Government for alleged *Brady* violations. Like the first claim, the second fails to satisfy any of the three requirements of *Brady*. These claims are meritless and should not continue to disrupt this proceeding.

## Background

　　　　In discovery, the Government has produced more than 50,000 pages of records detailing the charged crimes, as well as extensive material related to the victims in this case. For example, the Government has provided the following material related to the victims in this case: hours of recorded interviews with the victims, proffer letters, medical records, social media accounts, criminal histories, reports detailing disclosure of irrelevant sexual

1

encounters, recorded prior statements, and sealed adoption records, among others. In addition to these disclosures, the Government has assisted the Defendant by obtaining additional police reports, audio, and video maintained by third-party law enforcement agencies when requested by the Defendant's counsel. Finally, undersigned counsel has helped defense counsel find documents within discovery whenever asked to do so. *See, e.g.*, Def. Ex. C, ECF 147-3 ("In response to your question today, Debra, the audio of AV7's initial reporting can be found at BENDAWALD_000836.").

The Government has produced this and other material *even when it is not legally obligated to do so*. For instance, after the Defendant's first motion to for sanctions for alleged *Brady* violations, the Government produced internal emails between undersigned counsel and prison facilities to arrange counseling for the victims. As another example, the Government has documented its contact with Court staff to arrange for courtroom viewing by victims. Additionally, it has produced emails coordinating *Garrity* team filters, communications with victims' attorneys, and voicemails left for undersigned counsel.

Simply, the Government has extended every courtesy to the Defendant's counsel—and it has gone above and beyond its obligations under *Brady* and *Giglio*.

In preparation for trial, the Government has coordinated with dozens of witnesses to ensure trial presentation is as seamless as possible. Continuously, the Government documents new information provided by witnesses as it is disclosed. Additionally, the Government has, in good faith, attempted to fulfill the Defendant's request to document any contact with a victim—despite no legal obligation to do so.

As part and parcel of those efforts, on Friday, September 5, the Government produced three categories of information. First, FBI reports documenting recent contact with trial witnesses and victims. Second, Caldwell City Police Department reports from the Defendant's policing activities in July of 2017. Third, POUT records, which document the Defendant's failure to log evidence.

**FBI Reports**

In the first category, the Government produced four one-page Federal Bureau of Investigations ("FBI") reports documenting: (1) contact with G.B. communicating the one-day delay of trial; (2) contact with T.T. discussing whether Ben Heinrich was involved in sexual misconduct; (3) contact with E.J. (the victim in the now-dismissed Counts 7 and 8); and (4) a report documenting new information related to Jesse Cooper's substantive testimony. Each is discussed further below.

In the first contact, Agent O'Neil told G.B. that her testimony was being delayed by one day due to the Defendant's Motion to Continue. In the report, Agent O'Neil stated:



Heinrich. These questions were asked in anticipation of a possible rebuttal case should the Defendant claim that Ben Heinrich raped G.B.—not him. Of course, these questions were asked based entirely on the speculation of undersigned counsel after she reviewed the recently provided defense exhibits. This topic was not raised or addressed by T.T. during her testimony in the Government's case in chief. Regardless, the Government promptly documented her statements in the following report:



At 6:52 a.m. on Friday, the Government also produced via email a report documenting statements by Jesse Cooper about the topics of his anticipated testimony. Officer Cooper was slated to testify Friday afternoon. To ensure defense counsel did not miss this report, undersigned counsel highlighted it in her email. Undersigned counsel also attached the report to the email to ensure defense counsel had it before Mr. Cooper took the stand later in the day.

```
From:         Horwitz, Kate (USAID)
To:           Debra Groberg; Nathan Pittman
Cc:           Zebari, Frank (USAID); Rocca, Pam (USAID)
Subject:      Document: BENDAWALD_047215
Date:         Friday, September 5, 2025 6:52:30 AM
Attachments:  202509050650421 BENDAWALD_047215.PDF
```

Morning Debra and Nate,

Attached is a report on our trial prep with Jesse Cooper. We'll also be providing CPD reports and body cams from July 2017 today. We do not intend to use this material during our case in chief.

Thanks,

Kate

**July 2017 Reports**

In addition to these three FBI reports, the Government produced 197 records documenting the Defendant's policing in July of 2017 (hereinafter, "Government July Reports"). The Government requested these documents from the Caldwell Police Department ("CPD") on September 2 after reviewing the defense trial exhibits and in anticipation of an alternative-perpetrator defense.

**POUT Records**

Finally, CPD voluntarily disclosed to the Government 154 documents that detail when the Defendant failed to upload body camera footage or other evidence—the so-called "POUT" documents. The Government did not know these records existed nor did it specifically request them. Once offered, however, the Government accepted them.

Within two days of obtaining all of these records, the Government produced them to the defense. While former CPD Lieutenant Dave Wright was on the stand Friday afternoon, the Defendant moved to dismiss all charges in the superseding indictment, citing

the disclosure of the *first two* FBI reports and CPD records as exculpatory evidence that the Government had suppressed. Accordingly, he moved to dismiss all charges in the Superseding Indictment.

Since then, the Defendant has filed a brief in support of his oral motion and abandoned his request to dismiss all charges. Presently, the Defendant seeks dismissal of Count One based on the disclosure of the G.B. FBI report, which he asserts violated the Government's obligations under *Brady*. Next, he claims that the Government failed to meet its discovery obligations under Federal Rule of Criminal Procedure 16(a)(1)(E), which he argues warrants striking G.B.'s testimony. The Court should deny both requests.

I.    **The Government has satisfied its discovery obligations under Federal Rule of Criminal Procedure 16.**

The Government complied with Rule 16's ongoing obligation to promptly produce material.

    A.    **Background on July 2017 Reports**

In his motion, the Defendant recognizes that he obtained reports and body-worn camera footage from his police activity during July of 2017. *See* Motion, ECF 209, at 5. In their discovery, the defense produced thousands of records of CPD reports, body camera footage, and related police documents. Included in these productions were nine reports related to July of 2017: specifically, CPD Incident Numbers 17-19436, 17-19668, 17-19634, 17-18286, 17-18007, 17-16986, 17-17165, 17-17795, and 17-19215 (hereinafter "Defendant July Reports"). In some, but not all of the Defendant July Reports, the Defendant's police work is documented during the month of July 2017—demonstrating that he was wearing a blue police uniform and driving a marked CPD vehicle.

The Defendant admits that the Government's production of the Government July Reports overlaps with the Defendant July Reports he had already obtained during his own investigation. *See* Motion, ECF 209, at 5 ("The defense, through its own investigation, has obtained some of the records the government disclosed (but often in redacted form) as part of its large production through public records requests, as well as additional records from July 2017."). The extent of this overlap is unclear to the Government, however. Yesterday, undersigned counsel asked the defense to clarify what material from the Government July Reports the Defendant had already obtained through his own investigative efforts. The defense did not respond. In its defense discovery, however, the Defendant produced an email from April of 2025 wherein he received July 2017 CPD Records:

```
From:         Alisa Gulley
To:           Debra Groberg; Nathan Pittman
Cc:           PolicePublicRecordsRequest
Subject:      FW: SDT
Date:         Monday, April 7, 2025 4:13:27 PM
Attachments:  image002.png
              July 2017-Bendawald.pdf
              Bendawald Radio log Dec 3 2018.pdf
              Bendawald Radio Log March 11 2021.pdf
              Bendawald Radio log March 12 2023.pdf
              McGrew Calls 12031018.pdf
              McGrew Radio Log 12032018.pdf
              Bendawald law Dec 3 2018.pdf
              Bendawald law March 11 2021.pdf
```

Reference SDT case no. **1:23-cr-00281-DCN**

1. Computer aided dispatch records, GPS, or similar records in the Spillman system or any other database, showing any and all calls (including whether the officer was on/off duty) made to dispatch by Ryan Bendawald (Badge #183, spillman username "bendawar"), or other data about his location or duty status, on the following dates:
   * July 1, 2017 through July 31, 2017:
   * December 3, 2018;
   * March 11, 2021; and
   * March 12, 2021

2. Computer aided dispatch records, GPS records, or similar records in the spillman system or any other database, showing any and all calls made to dispatch by Casey McGrew (Badge #B144), or other data about his location or duty status, on December 3, 2018.

**In answer to question** 1. I am attaching law records list in Spillman - from July 1 to July 31, 2017 for Ryan Bendawald. We share a server with Canyon County S.O. and I was not able to access any radio logs from 2017. This might be something that needs to be asked of Canyon County IT dept.

This email confirms that the Defendant had the "July 2017-Bendawald.pdf" reports" he requested five months ago. Moreover, defense discovery demonstrates that the Defendant obtained other 2017 CPD reports that were not disclosed to the Government. *See* Exhibit 2. To date, the Defendant has not confirmed what 2017 reports he has obtained and the extent of that overlap with the Government July Reports.

Regardless, the Government July Reports simply reinforce what the Defendant July Reports already showed: the Defendant was wearing a blue uniform while he policed and driving a marked CPD vehicle. Thus, whatever difference the Government July Reports may have had on the Defendant's trial preparation is minimal—if at all. And, more importantly, the Government has satisfied its discovery obligations under Rule 16(c), as discussed below.

### B.  Applicable Law

Federal Rule of Criminal Procedure 16 requires the Government to produce five categories of discovery upon a defendant's request: the defendant's written and oral statements, the defendant's prior criminal record, documents and objects that are material to preparing the defense and/or that the Government intends to use in its case-in-chief, reports of examinations and tests, and summaries of expert witness testimony. Fed. R. Crim. P. 16(a)(1). The Government also has a continuing duty to promptly disclose additional evidence or material to the defendant as it is discovered. Fed. R. Crim. P. 16(c). "Rule 16 does not provide hard deadlines, however, a party's obligation to disclose evidence to the opposing side is triggered when evidence comes into that party's possession." *United States v. Barber*, No. 3:19-cr-00093-TMB, at *6 (D. Alaska Sep. 2, 2020); *see also United States v. Avalos-Gonzalez*, 156 F.3d 1239,at *5 (9th Cir. 1998) (holding the Government had

8

"substantially complied with Rule 16 because it promptly disclosed the substance of newly discovered statements").

    **C.**    **Argument**

The Government's production of materials follows the requirement of Rule 16(c). The production is timely. Rule 16(c) contemplates the production of materials during trial. Fed. R. Crim. P. 16(c) (requiring disclosure under certain circumstances if a party "discovers additional evidence or material before or during trial"). *See United States v. Tuschoff,* No. 1:19-cr-00233-1-DCN, 2021 U.S. Dist. LEXIS 29515, at *7 (D. Idaho Feb. 16, 2021) ("Rule 16(c) outlines an on-going or "rolling" discovery schedule that requires "[a] party who discovers additional evidence or material before or during trial," to "promptly disclose its existence to the other party," if the information is material or the opposing party has requested the disclosure."); *United States v. Swenson*, 298 F.R.D. 474, 477-78 (D. Idaho 2014) ("the Court cannot ignore the provisions of Rule 16(c) which imposes a duty upon a party discovering additional evidence or material *before or during trial* to promptly disclose it to the other party if it is subject to discovery under Rule 16.")

Here, the Government disclosed the materials just days after that material came into its possession. The Defendant's argument that Government violated Rule 16 is without merit and should be denied.[1]

---

[1] Even if a Rule 16 violation occurred (it did not), dismissal would be inappropriate. Rule 16(d)(2) empowers the Court to remedy the violation by granting a continuance, prohibiting the violating party from introducing the evidence at issue, or "any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). The Ninth Circuit has recognized that trial courts have "broad allowance to prescribe any sanction that is 'just.'" *Ordonez v. United States*, 680 F.3d 1135, 1140 (9th Cir. 2012); *see* Fed. R. Crim. P. 16(d)(2). The sanction cannot be harsher than necessary to accomplish the goals of Rule 16 or disproportionate to the conduct of counsel. *United States v. Gee*, 695 F.2d 1165, 1169 (9th Cir. 1983); *United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987). Courts

II.  **The Government has and will continue to produce all material pursuant to *Brady*, *Giglio* and their progeny.**

In his Motion, the Defendant claims that the Government violated its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing the two FBI reports before G.B. and T.T. testified on Thursday. Next, the Defendant asserts that the POUT records were likewise favorable and suppressed by the Government, resulting in a second *Brady* violation. As detailed herein, the Government has diligently satisfied its discovery obligations: it has not suppressed any evidence, let alone exculpatory evidence. Accordingly, the Defendant's latest motion for sanctions should be denied.

A.  **Applicable Law**

Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *Brady* requires the disclosure of "impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280, (1999). Disclosures "must be made at a time when disclosure would be of value to the accused." *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) (quoting *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988)).

To violate *Brady*, three elements most be shown: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

---

generally disfavor the exclusion of evidence as a remedy for Rule 16 violations. "Exclusion is an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'" *United States v. Finley*, 301 F.3d 1000, 1018 (9th Cir. 2002) (quoting *Taylor v. Illinois*, 484 U.S. 400, 415 (1988)); *see also United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir. 1991) (holding district court erred in excluding testimony of forensic pathologist because no willful or blatant discovery violation occurred).

evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. As recently described by the Ninth Circuit:

> While "[t]he term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence," the Supreme Court has explained that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Parker v. Cnty. of Riverside*, 78 F.4th 1109, 1113 (9th Cir. 2023) (quoting *Strickler*, 527 U.S. at 281). Thus, the evidence must be material such in the sense that there is a reasonable probability of a different result. *See id.*

### B. Argument

The Defendant incorrectly claims that the Government violated *Brady* by suppressing evidence. The Government has satisfied its discovery obligations and will continue to do so; none of the three elements of *Brady* have been satisfied.

**1. The Evidence is Not Exculpatory**

The Defendant asserts two categories of material are exculpatory: (1) the FBI Reports related to G.B. and T.T.; and (2) the POUT documents.

It is entirely unclear to the Government how either FBI report touches on the substantive testimony of either witness. Nothing about the communication of the one-day trial delay affected anything of substance related to G.B.'s testimony—it was purely a logistical contact. By the time G.B. testified, the Government had already produced 15 different reports documenting its contact with G.B. on the following dates: (1) April 20, 2022; (2) April 26, 2022; (3) May 6, 2022; (4) April 25, 2023; (5) September 1, 2023; (6) October 6, 2023; (7) October 27, 2023; (8) April 4, 2024; (9) May 24, 2024; (10) October 18,

2024; (11) May 21, 2025; (12) June 10, 2025; (13) June 27, 2025; (14) August 5, 2025; and (15) August 28, 2025. The Defendant's insistence that the sixteenth contact was crucial to its ability to impeach G.B. about her motivations to testify is implausible. *See* Motion, ECF 209, at 11. Nor is it clear how this sixteenth contact "altered the . . . defense strategy."

Like the first report, it's unclear to the Government how T.T.'s statement about Ben Heinrich relates to the Defendant's ability to cross examine her about the Defendant's sexual solicitation of her. Nevertheless, if the Defendant wants to recall T.T. to question her about whether Ben Heinrich also sexually solicited her, this recall will remedy whatever concern the defense has in their ability to examine T.T.—and, as discussed further below in Part III, offer an alternative to the extreme remedy of dismissal of the charges the Defendant seeks.

As to the second category of material, the POUT records, CPD volunteered production of these records detailing the Defendant's failure to document his body camera footage, dash camera footage, and evidence. The only production that involves a victim in this case is a reproduction of material originally produced to the defense on May 21, 2025. The remaining reports are unassociated with any victim or charge in this case and simply demonstrate a lack of diligent record keeping—something documented throughout the voluminous discovery in this case. Thus, the Defendant's attempt to recast this material as exculpatory stains credulity.

2. **The Government promptly produced all material and suppressed nothing.**

The Government has not suppressed any material—in fact, it has diligently worked to ensure all material it receives is promptly produced.

Here, all material was produced within two days of receipt. The Defendant makes much ado about the "delay" of the FBI reports. *See* Motion, ECF 209, at 14–15. But he misunderstands the efforts necessary to create these reports. Specifically, all FBI reports must be drafted in the physical space of the FBI Field Office in the Wells Fargo building in downtown Boise. So, for example, when Agent O'Neil told G.B. that trial was being delayed by one day (thus, causing her to testify on Thursday, not Wednesday), Agent O'Neil had to physically go to the FBI Office, access the report software, write the report documenting his discussion of trial logistics with her, and submit it for approval.

Once the FBI Supervisory Special Agent ("SSRA") approves the report, it is finalized and rerouted to Agent O'Neil. To provide this report to the U.S. Attorney's Office, Agent O'Neil must then return to the physical office space of the FBI Field Office and transmit the report to a paralegal at the U.S. Attorney's Office. This paralegal then bates stamps the document and uploads it for defense counsel via a cloud sharing system. Accordingly, production of these reports is not as streamlined as the defense suggests. Regardless, a two-day turnaround from receipt to production is not suppressing anything.

Understanding the defense's desire for a quick turnaround, however, the Government will directly email any new statements from witnesses during trial in lieu of the cumbersome procedure outlined above. That way, the defense will receive these statements as quickly as possible.

Next, taking a conspiratorial approach, the Defendant argues the bare bones nature of G.B.'s report proves Agent O'Neil "suppressed" evidence. *See* Motion, ECF 209, at 15–16. He claims that there could be no legitimate basis for coordinating with G.B. because "she was in custody and would be moved in and out of the courtroom by law enforcement."

*Id.* at 16. The Defendant's unsubstantiated allegation is just one of many made in his latest motion seeking dismissal of the charges against him.

As previously described, the G.B. FBI Report simply documented the communication with G.B. letting her know that trial was postponed by one day. It is one of dozens made by the Government to make sure that those who are called to testify are informed of the appropriate time to do so—a constant moving target. The Defendant's baseless allegations are nothing more than an attempt to recharacterize a routine contact as something more nefarious to obtain a windfall. Nothing but his own speculation supports this argument.

### 3. Willful Withholding of FBI Reports

The Defendant also asserts that undersigned counsel willfully withheld the G.B. and T.T. FBI reports and deliberately misrepresented the nature of the disclosure to the defense in her email. This is so, he argues, because the Government highlighted and attached the materials related to Jesse Cooper's forthcoming testimony, which, the Defendant argues, highlighted that undersigned counsel did not do the same for the G.B. and T.T. reports. *See* Motion, ECF 209, at 15. Not so.

Undersigned counsel has made every effort to assist the defense in obtaining and understanding the discovery. Counsel's early-morning email highlighting the statements related to a forthcoming witness's trial testimony reflects these efforts. Unlike Jesse Cooper's statements, however, neither FBI Report related to G.B. or T.T. touched on their anticipated trial testimony. Accordingly, undersigned counsel did not highlight it for the defense. Rather than evidence "willfulness," this email highlights the efforts undertaken to ensure the production of such material to the defense.

Moreover, the fact that the Government went above and beyond its requirements on one occasion does not mean it fell short of its discovery obligations on other occasions.

In his motion, the Defendant also cites to the mistaken bates numbers on the Government's discovery letter for this production. To the extent that the defense seeks to impugn this mistake as an intentional misdirection on the part of the undersigned counsel, he is in error. *See* Motion, ECF 209, at 2. Undersigned counsel sent support staff an early-morning email telling them to produce the material "ASAP," which they did hours later. As part of this production, a member of the support team drafted a discovery letter with the incorrect bates numbers. Thus, to impugn ill motive from this honest mistake on undersigned counsel's part is simply not supported by the facts. Simply, this production was neither material nor suppressed.

Finally, it did not prejudice the Defendant. *Brady* and *Giglio* do not require the production of any particular type of material. Rather, due process requires that material exculpatory and impeachment information be provided to the defense in some useable form. *See United States v. Bond*, 552 F.3d 1092, 1096 (9th Cir. 2009) (prosecutor does not "suppress" information under *Brady* if defendant is provided with sufficient facts from which he can independently ascertain exculpatory information).

### III.   No rule of criminal procedure, statute, or case requires the Government to record every communication and contact with witnesses during trial.

The Government is not required to document every logistical contact with every trial witness: no Rule of Criminal Procedure, statute, or case mandates such expansive documentation.

A.    **Legal Framework**

No Rule of Criminal Procedure, statute, or case requires the Government to document *every* contact with *every* trial witness (let alone video or audio record every interaction as the Defendant requested). Rule 16(a)(2) generally bars the discovery of statements of prospective government witnesses unless the statement falls under the reach of the Jencks Act, 18 U.S.C. § 3500. The Jencks Act provides that "no statement or report in possession of the United States which was made by a Government witness or prospective Government witness . . . shall be the subject of subpoena, discovery or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); *see United States v. Mills*, 641 F.2d 785, 790 (9th Cir. 1981). Federal Rule of Criminal Procedure 26.2 is virtually identical to the Jencks Act, was designed to incorporate Jencks into the criminal rules, and provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

Fed. R. Crim. P. 26.2.

The term "statement" is defined by Rule 26.2(f)(1) as including "a written statement that the witness makes and signs, or otherwise adopts or approves." Accordingly, Jencks and Rule 26.2 require the government to provide the defense with any statement made by a government witness which has been adopted or approved by the witness, *and which relates to her testimony on direct examination*.

Draft documents are incomplete until finalized and are not considered adopted or approved written statements under Jencks. *See United States v. Reed*, 575 F.3d 900, 921 (9th Cir. 2009) (holding rough notes were not a "statement" under the Jencks Act because "[o]nly later, when the agent prepares his formal interview report, will the agent make the complete statement envisioned by the Jencks Act" (internal quotation marks omitted)).

Under the Jencks Act, "[o]nly statements of a government witness that relate to that witness's testimony must be disclosed," and the "doctrine has not been extended to require the government to produce an entire investigative file." *See Blackfoot Livestock Com'n v. Dep't of Agriculture, Packers & Stockyards*, 810 F.2d 916, 923 (9th Cir. 1987). For production under Jencks, a government witness's prior statement must not only be the witness's own words, but should also be in the nature of a complete recital that eliminates the possibility of portions being selected out of context. *See United States v. Bodadilla-Lopez*, 954 F.2d 519, 522 (9th Cir. 1992). When a "statement" falls within Jencks, it is subject to discovery *after* the witness has testified on direct examination. *See* 18 U.S.C. § 3500(a); *see also United States v. Taylor*, 802 F.2d 1108, 1118 (9th Cir. 1986).

B.    **Argument**

The disclosures made in the FBI reports as to trial logistics are neither Jencks, *Giglio*, or *Brady*. It is not impeaching material as to the witnesses, it is not a Jencks statement, nor is it clear how either report is favorable to the defense. Simply, there is no legal obligation to provide this information.

Rule 16(a)(2) generally bars the discovery of statements of prospective government witnesses unless the statement falls under the reach of the Jencks Act, 18 U.S.C. § 3500. The Jencks Act provides that "no statement or report in possession of the United States which

was made by a Government witness or prospective Government witness . . . shall be the subject of subpoena, discovery or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a); *see United States v. Mills*, 641 F.2d 785, 790 (9th Cir. 1981). Nevertheless, even though not required to do so, the Government has produced numerous logistical communications with witnesses and victims in an effort to be transparent.

**IV.    The extreme sanction of dismissal of all charges is wholly inappropriate here: the Government has and will continue to satisfy its discovery obligations, and no violation of *Brady* or Rule 16 has occurred—let alone a "flagrant" one.**

Finally, the Defendant asked this Court to dismiss Count One. The extreme sanction of dismissal is only warranted when a *Brady* violation rises to the level of a "flagrant prosecutorial misconduct." Here, there is no *Brady* violation—let alone a "flagrant one."

**A.    Legal Framework**

"A district court may dismiss an indictment for government misconduct for one of two reasons, each with its own standard: either because it finds a serious due-process violation or because it concludes that dismissal is warranted under its supervisory powers." *United States v. Bundy*, 968 F.3d 1019, 1030–31 (9th Cir. 2020). "Dismissal for a due-process violation requires the government's conduct to 'be so grossly shocking and outrageous as to violate the universal sense of justice.'" *Id.* "The [due process argument] is usually raised in situations where law enforcement conduct involves extreme physical or mental brutality or

where the crime is 'manufactured by the government from whole cloth.'" *United States v. Green*, 962 F.2d 938, 942 (9th Cir. 1992) (citation omitted).

A district court may also dismiss an indictment under its supervisory powers "[o]nly where the government withheld *Brady* material through 'flagrant misconduct,' causing 'substantial prejudice' to the accused." *Bundy*, 968 F.3d at 1031. Neither extreme situation is present here.

### B. Argument

The Government has diligently produced material throughout this case and will continue to do so. The latest production of material occurred two days after the Government received it. And, as discussed above, none of the material satisfies the three, conjunctive prongs of a *Brady* violation. Thus, there is no violation to remedy.

Even if the Court were concerned about the Defendant's ability to ask T.T. whether a different CPD Officer also engaged in sexual misconduct, dismissal would be unwarranted. Instead, the Government could simply recall T.T. to allow the defense to cross examine her on whether Ben Heinrich was a sexual predator. This could be done without any opportunity of further examination from the Government thus, avoiding the unfair-advantage claims by the Defendant. Importantly, the Defendant does not seek this opportunity—instead he seeks the windfall of dismissal of the criminal charges against him. Nothing warrants this extreme sanction, which would amount to a miscarriage of justice and a substantial waste of judicial resources.

### Conclusion

Twice in one month the Defendant has requested sanctions be imposed and accused undersigned counsel of serious violations under *Brady*. Like the first claim, the second fails

on all three prongs of *Brady*. The Government is aware of its ongoing discovery obligations and, as with every case, will comply with these requirements.

Respectfully submitted this 6th day of September, 2025.

JUSTIN D. WHATCOTT
Acting United States Attorney
District of Idaho

By:   /s/ *Katherine Horwitz*
Katherine L. Horwitz
Assistant U.S. Attorney

/s/ *Francis J. Zebari*
Francis J. Zebari
Assistant U.S. Attorney